## McCORMICK v. KING et al.

### (Circuit Court of Appeals, Ninth Circuit. April 9, 1917. Rehearing Denied June 4, 1917.)

### No. 2742.

1. BANKS AND BANKING ⬤⟹256½—OFFICERS AND DIRECTORS—LIABILITY TO CREDITORS.

It is no defense against the liability of officers and directors of a national bank for permitting large overdrafts in violation of the by-laws that the practice was customary with other banks.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 958, 959.]

2. BANKS AND BANKING ⬤⟹256½—NATIONAL BANKS—LIABILITY OF DIRECTORS.

The statutory liability of directors of a national bank, as prescribed in Rev. St. § 5239 (Comp. St. 1916, § 9831), is undoubtedly the measure of the right of recovery against them for a loss resulting solely from their violation of the express provisions of the statute; but that does not exclude their common-law liability for negligence in the management of the business of the bank, in violation of their oath of office, which results in loss to its creditors and stockholders.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 958, 959.]

3. BANKS AND BANKING ⬤⟹256½—NATIONAL BANKS—LIABILITY OF DIRECTORS.

That a director of a national bank, at the time of his appointment and throughout his directorship, resided 200 miles distant, and never attended a directors' meeting, nor gave any attention to the business of the bank, but relied entirely on those in active charge, does not relieve him from liability for losses resulting from their gross mismanagement.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 958, 959.]

4. BANKS AND BANKING ⬤⟹256½—NATIONAL BANKS—DUTIES AND LIABILITIES OF DIRECTORS.

Where the managing officers of a national bank allowed certain depositors to continuously overdraw, taking notes for the overdrafts without adequate security, until the indebtedness in each case exceeded the limit fixed by the statute, and were permitted by the directors to continue such course until the bank became insolvent, the liability of the directors is not limited to that prescribed by Rev. St. § 5239 (Comp. St. 1916, § 9831), for knowingly violating or permitting the violation of the provisions of the statute, but is measured by the rule of the common law, which requires active and diligent performance of their duties, and they are liable, not only for the excess of such loans above the legal limit, but for the entire loss thereon, with interest.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 958, 959.]

Appeal from the District Court of the United States for the Eastern Division of the District of Idaho; Frank S. Dietrich, Judge.

Suit in equity by Frank R. McCormick, receiver of the First National Bank of Salmon, against Harry G. King, Norman I. Andrews, George Buck, Guy E. Bowerman, Fred G. Haveman, John Lottridge, and E. S. Edwards. From the decree, complainant appeals. Reversed.

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Jesse R. S. Budge, of Pocatello, Idaho, J. M. Stevens, of Salmon, Idaho, and Carl Barnard, of Pocatello, Idaho, for appellant.

Richards & Haga and McKeen F. Morrow, all of Boise, Idaho, for appellee Bowerman.

E. W. Whitcomb, of Salmon, Idaho, for appellees King and Andrews.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. This suit was brought by McCormick, as receiver of the First National Bank of Salmon, Idaho, against defendants King, Andrews, Buck, Bowerman, Haveman, Lottridge, and Edwards, to obtain an accounting of the affairs of the bank, and to determine the liability of the respective defendants, and for judgment against the defendants, respectively, according to their respective liabilities, and to recover money alleged to have been negligently wasted and lost and illegally received by the directors, and for general relief. After trial to the court, decree was entered against the defendants King and Andrews, and in favor of the defendants Bowerman and Edwards, and suit was dismissed for lack of service upon defendants Buck, Haveman, and Lottridge. McCormick, as receiver, appeals.

The bank, which had done a general banking business from January, 1906, to June, 1911, suspended business on June 8, 1911, and in August, 1911, was put into the hands of a receiver. The original capital of the bank was $25,000, divided into 250 shares, of $100 each, but about February, 1910, the capital stock was increased to $50,000, divided into 500 shares, of the face value of $100 each. In January, 1912, after suspension, the Comptroller of the Currency assessed the stockholders to the full face value of the shares of stock of the shareholders, respectively, amounting to $50,000, of which amount $20,000 was paid to the receiver, but owing to the insolvency of a number of the shareholders the receiver will be unable to collect approximately $20,000 of the assessment, and after realizing on the assets of the bank there will be a deficiency of approximately $20,000 of unpaid obligations. The defendants King, Andrews, and Bowerman were members of the board of directors at the time of the organization of the bank, and continued to be directors until the receiver took charge. King was president, except during the year 1908, when he was cashier and general manager. Andrews was vice president from January, 1908. Buck and Lottridge (not served) were directors from and after November 17, 1909, and up to the suspension of the bank; Lottridge having been acting cashier from January 1, 1910, until June 8, 1911. Haveman was a director and assistant cashier from January 18, 1910, until the failure of the bank. Edwards was a director from May 15, 1906, until January 18, 1910.

The complaint is that the defendants, as directors, knowingly permitted the making of loans by the officers of the bank in excess of the limit provided by section 5200 of the Revised Statutes of the United States, whereby large sums were lost to the bank, and that they mismanaged the affairs of the bank, and negligently permitted

overdrafts whereby loss to the bank will accrue. The answering defendants denied any liability.

The receiver assigns as error the adjudication that the defendants King and Andrews are liable in the sum of only $14,700, that sum being the liability measured by sections 5147, 5200, and 5239 of the Revised Statutes of the United States (Comp. St. 1916, §§ 9685, 9761, 9831), and not by the common law; also the action of the court in dismissing the complaint as against Bowerman, whom the court found to be not guilty of such neglect of duty as a director of the bank as to render him liable, either under the sections of the United States statutes heretofore quoted or at common law. For convenience we quote, so far as material, sections 5147, 5200 and 5239:

"Sec. 5147. Each director, when appointed or elected, shall take an oath that he will, so far as the duty devolves on him, diligently and honestly administer the affairs of such association, and will not knowingly violate, or willingly permit to be violated, any of the provisions of this title," etc.

"Sec. 5200. The total liabilities to any association, of any person, or of any company, corporation, or firm for money borrowed, including, in the liabilities of a company or firm, the liabilities of the several members thereof, shall at no time exceed one-tenth part of the amount of the capital stock of such association actually paid in. But the discount of bills of exchange drawn in good faith against actually existing values, and the discount of commercial or business paper actually owned by the person negotiating the same, shall not be considered as money borrowed."

"Sec. 5239. If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this title, all the rights, privileges, and franchises of the association shall be thereby forfeited. Such violation shall, however, be determined and adjudged by a proper circuit, district, or territorial court of the United States, in a suit brought for that purpose by the Comptroller of the Currency, in his own name, before the association shall be declared dissolved. And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation."

The by-laws of the bank, adopted October 9, 1906, contained, among other things, provisions requiring the directors to hold regular meetings on the first Tuesday of each month and special meetings as the president, cashier, or any three or more members might require. There was a provision for a loans committee, consisting of the president, one director, and the cashier, with power to make loans, discount bills, buy and sell bills of exchange, and whose duty it was to report at each regular meeting of the directors concerning all bills and other evidences of debt discounted and purchased by them for the bank since their last previous report. Section 19 of the by-laws forbade any officer or clerk to pay any check drawn, or to pay out money on any order, unless the drawer of such check or order, at the time of the presentation thereof, had money on deposit sufficient to meet such check or order. Section 29 provided for the appointment by the board of directors of a committee of three members to examine each month the affairs of the bank, compare its assets and liabilities with the accounts of the general ledger, ascertain if the accounts are correctly kept, the condition of the bank, whether in sound and solvent condi-

tion, and to recommend to the board such changes in the method of doing business as might seem desirable, the result to be reported to the board at its next regular meeting. Thereafter, on January 18, 1910, the by-laws were amended so as to require the board of directors at each monthly meeting of officers to examine and approve all loans and discounts, and provided that such approval should be kept in a book for that purpose. King and Andrews were present at the meeting.

Three matters became important upon the trial and are specially dwelt upon in the briefs of counsel. The Salmon Lumber Company was a corporation, the controlling interest in which was owned by the relatives of defendant King. Commencing back in 1910, it had borrowed money from the bank at various times, and was permitted to overdraw its account in large sums. The amounts of the overdrafts were put into notes, and when the bank suspended the lumber company owed notes to the bank for about $13,629.20 and accrued interest, amounting to $5,408.62 at the time of the trial of this suit in 1915. The District Court found that the loss on these loans would be $7,000. Loans to Harry Brown amounted to $11,760.25 and $5,-234.81 interest. Brown was an old customer of the bank, and, like the Salmon Lumber Company, was in the habit of making overdrafts, which were covered by notes taken in January, 1911. Brown was a lumber merchant, and co-operated with the Salmon Lumber Company and others in trying to control the lumber business in the Salmon section of Idaho. After suspension of the bank the receiver brought action and obtained judgment against Brown for $18,498.39 due to the bank, but execution upon the judgment was returned unsatisfied. The District Court found that the loss upon the debt of Brown would be $11,760.

There were loans to F. M. and S. A. Pollard, evidenced by two notes —one for $6,250, dated June 29, 1910; the other for $1,700, dated July 11, 1910. The interest on the notes aggregated $3,626.42. The receiver recovered judgment, but only $150 was realized on execution. The District Court found that the loss on account of these notes was $7,800. The total amount of the losses, as found by the District Court, aggregates $26,374.85, exclusive of interest and some costs. With interest, the amounts are brought up to $40,644.70 as of the date of the trial. There were also losses of about $3,900 from overdrafts by different persons, but the District Court took no account of them, and we shall not.

King and Andrews were present at nearly all the board meetings, and in 1910 Andrews was paid a salary for aiding the board in passing upon loans. They both knew of the large amount of overdrafts, which in the last half of December, 1910, had increased to $23,805.63, and on January 10, 1911, exceeded $28,657.91, although at the time the bank suspended the overdrafts were $9,800. The two were active in managing the affairs of the bank, were on the committees of loans and discounts, and of course were fully aware of the by-laws (section 19), which forbid overdrafts. King said, in effect, that all his actions had been in good faith; that the Salmon Lumber Company did a

large business, had assets, and seemed prosperous; that from time to time it made overdrafts, but that notes were given to cover such overdrafts; and that in this way the notes standing when the bank failed were contracted. Concerning the Brown loans, he said that Brown would often overdraw his account by giving checks to pay his men, and would later give notes to cover the amounts overdrawn as they had accumulated; that Brown was doing a good business, had a large contract, and he believed was making a profit, and could meet his obligations. With respect to the Pollard loan, he said that one note for $6,250 was the accumulation of prior notes, and the $1,700 note was to cover overdrafts; that he took the notes of Mr. and Mrs. Pollard, because Pollard had a building contract and a brickyard, and agreed to reduce his debt as brick was sold, but that, because of general depression, the sale of brick became less, and realty values depreciated; that Pollard had to place a mortgage upon his property, and that the bank could only secure a second mortgage, under which, after foreclosure of the first mortgage, the bank lost by the transaction. Witness said he knew Mrs. Pollard owned considerable land, and thought that she was solvent and good for the money loaned to her and her husband. When his attention was called to the fact that there were no entries of these several loans on the discount register (a book required to be kept by order of the Comptroller of the Currency), King said that, as the notes were given to cover overdrafts, and not direct loans, he did not treat them as "specific loans"; that he did not confer with the board of directors about these loans in the matter of overdrafts, but that on July 6, 1910, at a directors' meeting, a statement showed an aggregate of $17,138.85 as overdrafts, and that, while no items were made, the loans above referred to were included. When he was asked by the court to explain the allowing of overdrafts in the face of the by-law prohibiting them, King said that overdrafts were customary in all national banks; that the by-law forbidding them was simply a copy of the by-law of some other bank; that at the directors' meetings there was no discussion of overdrafts being in violation of law; that he tried to keep them down, but that they would "crop in." We quote from the record:

"When a check comes in, you have either got to throw it out or pay it, and it would work a detriment to the party, and it would injure your own business, if you throw them out, and you feel at the time that there is no question but what they will be paid in the future; and we were in the habit of letting people overdraw their accounts, sometimes, when they were starting out to buy a bunch of cattle, maybe, not knowing how much they would want.

"The Court: What I want to ask you more particularly is about these three or four accounts, the more important ones, the Pollard matter, and the Salmon Lumber Company, and the Brown matter. I think that you explained that these notes were given to take up accumulated overdrafts from time to time? A. Yes; your honor. Q. Were these overdrafts permitted without a previous arrangement, or in accordance with a previous arrangement? A. Just between myself and the parties. I told them that, if they would draw their checks on us, I would honor them. Q. That was done before they drew the checks, or afterwards? A. Done before they drew the checks; but I never anticipated that the thing would reach the proportions that it eventually did. But I got hold of it, and I sort of had to hold it up, but it got so large—I wasn't anticipating to advance them this money and let them draw on us for

it. They couldn't tell how much lumber was coming in, and they couldn't tell how much money they would want to use. I let them draw on the bank, and at the end of the month they would come in and cover it with a note, and I gave them the privilege of overdrawing their account, and that is customary in a great many banks."

Defendant Bowerman's position is somewhat different from that of King and Andrews. As already stated, Bowerman was a director from the organization of the bank in 1906 until the receiver took charge, but he had no executive position in the bank, never attended a meeting of the board of directors, and in fact never personally assumed any authority or control over the officers of the bank. He did nothing whatever in connection with the bank or its affairs. He was a business man, who lived at St. Anthony, Idaho, 200 miles distant from Salmon, where the bank was situated, and the evidence is that it would have been more or less inconvenient for him to make the trip necessary to go to Salmon to attend directors' meetings. Evidently he had confidence in those who directly managed the affairs of the bank, and never gave personal concern to his directorship or its attendant obligations.

Appellee would have us regard the action as restricted to one for the violation of the particular statutes heretofore quoted; but we think the complaint must be looked upon as broad enough to charge liability, not only for violation of the terms of the statutes quoted, but of the common-law duty to be honest and diligent. For example, after averring that the defendants King, Andrews, Bowerman, and others knowingly permitted and assented to the making of the loans to the Salmon Lumber Company, Brown, and the Pollards, which were in excess of the limit provided by section 5200, the complaint alleges that King, Andrews, and other directors, at the meetings of the board each month between January 18, 1910, and March, 1911, personally passed upon and knowingly approved each monthly statement of excessive loans which had been made through the president, Andrews, and the cashier, charged with the management and the conduct of the affairs of the bank, and willfully, negligently, and knowingly permitted King and Lottridge to make the loans to Brown and to the Pollards, whereby the funds of the bank were lost; that the moneys as aforesaid loaned to persons or associations who had no sufficient assets or security to give were negligently loaned, and that defendants negligently permitted overdrafts to certain persons. It is averred, too, that Bowerman, notwithstanding his oath as a director that he would diligently and honestly manage the affairs of the bank, and would not willingly permit any violations of law in the conduct of the bank, carelessly, willfully, and negligently failed to attend any meetings of the board of directors during the entire time of his directorship, and willfully, carelessly, and negligently failed during the entire time of his directorship to discharge the duties and obligations as a member of the board of directors in examining into and keeping well informed concerning its affairs, and particularly the loans made by the bank, and willfully and negligently failed to exercise proper, or any, supervision as a director of the affairs of the bank, but that, on the con-

trary, during the time the affairs of the bank were being "grossly mismanaged," with knowledge, from the published statements of the bank, required to be furnished by the Comptroller of the Currency, and from other sources, that the affairs of the bank were being grossly mismanaged, and that excessive and illegal loans were being made, negligently and willfully permitted King and Lottridge to make such loans, and particularly the loans to the Salmon Lumber Company, to the Pollards, and to Brown.

[1] The proofs showed the frequent allowance of large overdrafts to the three borrowers heretofore specially referred to, and that at times the respective amounts owing by such persons respectively exceeded one-tenth the amount of the capital stock of the bank. It is no defense, in an action of this character, for the officers who were in direct charge of the affairs of the institution that the by-law, which forbade the payment of checks unless the drawer had funds on deposit sufficient to meet such check, was copied from the by-laws of other banks, and that notwithstanding such by-laws other banks also often allow overdrafts. In the first place we are unwilling to accept the general statement of Mr. King, the president, as correct. No other banker was called upon to testify to such a custom, and we are disposed to look upon the testimony as but an effort of one overzealous to help excuse himself for his own conduct in the premises, and whose excuse is incompatible with the presumption that bank officials well and truly exercise their duties and keep within the limitations of the by-laws which have been regularly adopted. In the next place, even if it were true to an extent, such a practice would be no authority for bank officials to allow customers to overdraw in sums and incur liability in excess of one-tenth of the amount of the capital stock of the bank paid in. For months before this bank failed the frequent payment of large overdrafts must have made it apparent to the loan and discount committee of the bank that, if such acts of the officers were continued, it would mean a sacrifice of the interests of the stockholders. But the president and vice president and cashier went on in the practice of departure from duty, and suspension followed. We can therefore reach no conclusion other than that the acts referred to were not mere errors of judgment, but were in gross mismanagement of the bank, for which the defendants King and Andrews are liable under the general principles of the common law, as well as under the statutes heretofore quoted.

[2] The statutory liability of directors of national banks, as provided in section 5239, is undoubtedly the exclusive rule by which to measure the right to recover damages from directors based upon a loss alleged to have resulted solely from violation by such directors of a duty expressly imposed upon them by a provision of the National Banking Act. This was directly decided in Yates v. Jones National Bank, 206 U. S. 158, 27 Sup. Ct. 638, 51 L. Ed. 1002, and is approvingly referred to in Thomas v. Taylor, 224 U. S. 73, 32 Sup. Ct. 403, 56 L. Ed. 673. But in the former case the Supreme Court was very careful not to announce any rule whereby the law will relieve directors who are the active officers of the bank, and who know-

ingly and deliberately and repeatedly commit acts of such negligent management that the result has forced the bank into liquidation. In the case cited, supra, the court said:

"That the words 'shall knowingly violate, or knowingly permit,' etc., found in the first sentence of section 5239, Rev. Stat., were intended to express the rule of conduct which the statute established as a prerequisite to the liability of directors for a violation of the express provisions of the title relating to national banks, is additionally shown by the oath which a director is required to take, wherein, as already stated, he swears 'that he will, so far as the duty devolves on him, diligently and honestly administer the affairs of such association, and will not knowingly violate, or willingly permit to be violated, any of the provisions of this title.' Mark the contrast between the general common-law duty to 'diligently and honestly administer the affairs of the association' and the distinct emphasis embodied in the promise not to 'knowingly violate, or willingly permit to be violated, any of the provisions of this title.' In other words, as the statute does not relieve the directors from the common-law duty to be honest and diligent, the oath exacted responds to such requirements. But as, on the other hand, the statute imposes certain express duties, and makes a knowing violation of such commands the test of civil liability, the oath in this regard also conforms to the requirements of the statute by the promise not to 'knowingly violate, or willingly permit to be violated, any of the provisions of this title.'"

It is to be remembered that the case in which this language was used was one involving the civil liability of directors in respect to the making and publishing of the official reports of the condition of the bank, duties solely enjoined by the statute of the United States. The court took pains to use this language:

"Of course, in what has been said, we have confined ourselves to the precise question arising for decision, and therefore must not be understood as expressing an opinion as to whether and to what extent directors of national banks may be civilly liable by the principles of the common law for purely voluntary statements made to individuals or the public, embodying false representations as to the financial condition of the bank, by which one who has rightfully relied upon such representation has been damaged. And because we have applied in this case to the duty expressly imposed by the statute the standard of conduct established therein, we must not be considered as expressing an opinion upon the correctness of the views enunciated by the court below concerning the standard which should be applied solely under the principles of the common law, to fix the civil liabilities of directors in an action of deceit. See Briggs v. Spaulding, 141 U. S. 132 [11 Sup. Ct. 924, 35 L. Ed. 662]."

[3] Until within more recent years men not unfrequently were found in positions similar to Bowerman's. He seems to have been a man of affairs and standing in the community, and in the best of faith accepted a directorship in the Salmon Bank, and after his election was content to trust entirely to the officers of the bank, and did nothing himself in the performance of any duty incident to his directorship. Mr. Bowerman failed to keep himself advised of even general conditions, and was not even sufficiently actively interested to make inquiry of any kind about the affairs of the bank until it was found that those immediately in charge had, through gross mismanagement, brought the bank to failure, and that as a result the directors would be called upon to answer for losses. Let it be conceded that the inattention of a director situated as was Bowerman has been

brought about without any evil intention on his part, and that it may therefore work some hardship to hold him liable for the losses due directly to the positive negligence of the president and loan committee. But there is the other and wider view to be taken, that by which the law must always guard the interests of the institution and those of the public who were attracted to it—the interest of persons who have given their moneys to the custody of the bank, relying upon the belief that the directors, being men of integrity and business capacity, would at least make some effort to see that those in charge of the affairs of the institution would keep within the statutes and the bylaws which control. In the application of this wholesome doctrine, one who fails to make any effort to have the bank properly administered acts wrongfully, and becomes liable for nonaction. Chesbrough v. Woodruff, 195 Fed. 875, 116 C. C. A. 465.

The fact that Mr. Bowerman lived 200 miles away is not an excuse for him. He lived that distance from Salmon when he voluntarily accepted the directorship, and to exonerate him from neglecting to attend a meeting of the board or inquiring into the conduct of the institution would be practically to hold that there was no meaning and significance whatever to the oath he took that he would, so far as the duty devolved upon him, honestly and diligently administer the affairs of the association. No one would contend that a director must look into details of management, or keep closely in touch with routine matters, or know intimately to whom credits are given; but he is responsible for the exercise of supervisory control, and must be held to know something of the more important concerns of the association, and his duty in these respects is not lessened by the fact that to do his duty means some personal inconvenience. 7 C. J. 788, 789. If continued omission to give any attention could excuse, then the greater the inattention of a director to his duties the less the liability he would incur. The Supreme Court, in Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, 35 L. Ed. 662, said:

"Without reviewing the various decisions on the subject, we hold that directors must exercise ordinary care and prudence in the administration of the affairs of the bank, and that this includes something more than officiating as figure heads. They are entitled to commit much of the actual banking business to the cashier, president, and other officers, but * * * this does not absolve them from the duty of reasonable supervision, nor ought they be permitted to be shielded from liability because of want of knowledge of wrongdoing, if that ignorance is the result of gross inattention."

If the evidence showed any effort or attention on the part of Mr. Bowerman, his appeal might find some foundation of merit; but, as we scrutinize his course, it cannot be squared with any standard of ordinary care or reasonable diligence. Michie on Banks and Banking, vol. 1, § 53; Morawetz on Private·Corporations, § 554; Rankin v. Cooper (C. C.) 149 Fed. 1010. In Gibbons v. Anderson (C. C.) 80 Fed. 345, Judge Severens well said:

"What the public suppose, and have the right to suppose, is that those men have been selected by reason of their high character for integrity, their sound judgment, and their capacity for conducting the affairs of the bank safely and securely. The public act on this presumption, and trust their property with

the bank in the confidence that the directors will discharge a substantial duty. How long would any national bank have the confidence of depositors or other creditors if it were given out that these directors whose names so often stand at the head of its business cards and advertisements, and who are always used as makeweights in its solicitations for business, would only select a cashier, and surrender the management to him? It is safe to say that such an institution would be shunned and could not endure. It is inconsistent with the purpose and policy of the Banking Act that its vital interests should be committed to one man, without oversight and control."

[4] Our best judgment is that the liability of defendants King and Andrews, being for gross mismanagement, should have been measured in accordance with the rule of the common law, rather than solely according to the statute. It follows that there should not have been credited against the sums due by the Salmon Lumber Company, the Pollards, and Brown, respectively, the $6,500 (tenth part of the capital stock paid in) deducted in each instance by the District Court. The court disallowed all interest prior to the entry of the decree. In this respect we are also in disagreement with the decree, for we think that interest should have been included, to be calculated from the respective dates of the notes given by the Salmon Lumber Company, the Pollards, and Brown, respectively. For any sums paid upon any of the notes since the dates thereof, and for any other sums collected, credits, with interest thereon, should be allowed.

With respect to defendant Bowerman, our opinion is that his liability is also to be measured primarily by the rules of the general law, and that his want of knowledge of the gross mismanagement of King and Andrews was due to such inattention to the duty which was imposed upon him of exercising a reasonable supervision over the conduct of those in charge of the bank that he, too, is liable to the same extent as are King and Andrews, and that decree should accordingly go against him. Allen v. Luke (C. C.) 163 Fed. 1018; Williams v. Brady (D. C.) 221 Fed. 118; Id. (D. C.) 232 Fed. 740.

Inasmuch as there may have been some change in the amounts collected, which were due apparently when the decree was entered, the decree of the District Court is reversed, and the cause is remanded, with directions to the District Court to make ascertainment through the aid of a master, if deemed preferable, of the amounts due upon the Pollard, Salmon Lumber Company, and Brown loans as will accord with the views herein expressed, and that thereafter suitable decree be entered against defendants King, Andrews, and Bowerman.

Reversed and remanded.