## MICHELSEN et al. v. PENNEY et al.
### No. 124.

Circuit Court of Appeals, Second Circuit.

March 19, 1943.

See, also, D.C.S.D.N.Y., 10 F.Supp. 537.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

I. Gainsburg, of New York City, and Kendall A. Sanderson, of Boston, Mass. (Joseph P. Segal, of New York City, on the brief), for plaintiffs.

Peyton Randolph Harris, of New York City (Gibboney & Harris and Stuart G. Gibboney, all of New York City, on the brief), for R. C. Parsons, receiver.

Nathan L. Miller, of New York City (Gwinn & Pell, Harold H. Corbin, and Caleb C. Curtis, all of New York City, on the brief), for defendant.

CLARK, Circuit Judge.

This is an action by the members of a depositors' committee, for themselves and other depositors, of City National Bank in Miami, Miami, Florida, against James C. Penney, the chairman of the board of directors of the bank, to recover for losses claimed to have been caused it by his violation of duty as a director. A successor receiver to the original receiver who had been appointed on the bank's failure in December, 1930, was allowed to intervene; and he and, upon his death, his successor, the present receiver of the bank, have joined forces with plaintiff to urge recovery. A special master, appointed by the district court, held extensive hearings and then submitted his report, with detailed findings and the recommendation that the complaint be dismissed. The district court, however, sustained exceptions to the master's report, made its own extensive findings, supported by a careful opinion, 41 F.Supp. 603, and gave judgment in favor of the receiver for a substantial recovery. All parties have appealed, the plaintiffs and the receiver because they believe the recovery allowed was too small, the defendant because he thinks no recovery, or at the least a lesser one, should have been granted. In our view of the case, which is that a lesser recovery should be granted, a rather detailed review of the history of this failed national bank becomes necessary.

City National Bank and Trust Company of Miami, the predecessor of City National Bank in Miami, was formed in 1925. Shortly thereafter, upon the collapse of the Florida real estate boom, it took over the assets of two failed banks, upon a guarantee of their quality from two going banks, the First National Bank of Miami and the Bank of Bay Biscayne. As losses were realized upon large real estate investments thus inherited, the bank was compelled to seek new capital funds. In 1926 it successfully negotiated with various New York and Florida banks for a "pool loan" of $5,000,000, secured by a trust agreement pledging all its assets. This loan, however, proved to be a mere palliative. Again in financial straits in 1927, the bank sought the aid of defendant, James C. Penney, head of J. C. Penney Company, a nationwide retail dry goods and clothing chain store organization, and himself a heavy investor in Florida real estate through the J. C. Penney-Gwinn Corporation, of whose capital stock ten-elevenths was owned by him and one-eleventh by his personal attorney, Ralph W. Gwinn.

Penney arranged a syndicate loan of $1,000,000, which came to the City National Bank and Trust Company through its merger with the newly organized City National Bank in Miami, to whose capitalization the loan was applied. As one feature of the merger, doubtful assets of the City National Bank and Trust Company in the amount of $1,500,000 were charged off against its surplus of $500,000, and against its stated capital of $2,000,000. The $1,000,000 balance in the capital account was transferred to the new bank. Thus, the latter began operations with a stated capital of $1,000,000, represented by 10,000 shares of $100 par value each, and a surplus of like amount. The syndicate members had complete stock control of the bank, however, for, in addition to 5,000 shares received by them in return for their loan, the stockholders of the old bank gave them a bonus of 298 shares of the new organization and Penney-Gwinn Corporation purchased the equivalent of 405 shares from the stockholders of the old bank. In the syndicate, Penney-Gwinn became and was recognized as the dominant factor.

After the organization of the bank, defendant was elected a director and chairman of the Board; Saunders, agent and resident manager of Penney-Gwinn in Florida, became a director and vice-chairman of the Board; and Lewis, a vice-president and a director of Penney-Gwinn, became a director. In order that Saunders and Lewis might appear to comply with the National Bank Act, 12 U.S.C.A. § 72, requiring a national bank director to be a bona fide stockholder in his bank, Penney-Gwinn transferred qualifying shares to their names and received in return from each a noninterest-bearing note, wherein the maker reserved the right to deliver in payment of the note the equivalent number of shares of City National Bank in Miami at its then par value. Other directors were also qualified at various times in this fashion.

Immediately after the bank began business, its entire capital and surplus were applied to reduce the old "pool loan" contracted by the former City National Bank and Trust Company. These and other payments on the "pool loan," until it was wiped out in July 26, 1929, plus recurring losses on investments, so reduced the bank's capital that it was forced from the outset to resort to borrowings, principally from its largest stockholders. In fact throughout its life its borrowings generally exceeded the limit permitted by the National Bank Act, 12 U.S.C.A. § 82.

In addition, the bank underwent two recapitalizations. By the first, occurring February 20, 1929, doubtful assets in the amount of $1,000,000 were charged off against capital and surplus, each being reduced by one-half, and authorized capital stock was increased to 40,000 shares at $25 par value. The existing stockholders received two shares for every one of the old stock, and the balance of 20,000 shares was sold at $50 per share. Penney-Gwinn made purchases to the extent of $492,662.50. Capital and surplus thus were restored to $1,000,000 each.

By the second recapitalization, occurring April 4, 1930, and involving the controverted Tarrier transaction, the bank erased doubtful assets of $2,000,000 from its balance sheet. First, each stockholder contributed one-half of his holdings, permitting a reduction of capital and surplus to $500,000 each and producing a $1,000,000 offset. Next, the Tarrier Company of Delaware, a corporation organized for the purpose, contributed a second $1,000,000 offset, together with all its common stock, in return for such bank assets as had theretofore been charged off or which were regarded as doubtful. The Tarrier Com-

pany had an authorized capital of $1,000,000 par value preferred stock and 100 shares no par common stock. Penney and Penney-Gwinn had purchased preferred stock in the amount of $403,981.25, one C. M. Keyes had taken $159,082.50 worth of such stock, and the bank had lent the company $436,936.25 on security furnished by Penney-Gwinn. The bank's loan was ultimately paid off by Penney-Gwinn.

But matters went from bad to worse. On June 11, 1930, the failure of the Bank of Bay Biscayne precipitated a run on the City National Bank. Defendant and Penney-Gwinn lent the bank $880,000 by way of deposit, to tide it over the crisis, with the understanding that the money was to be repaid with interest as soon as the emergency was over. This expedient was successful, the bank survived the run, and by July 7, 1930, the loan had been repaid with interest, apparently in the real belief that the crisis had passed. At least the Penney-Gwinn deposits in the bank were increased from $171,602.13 on July 7, 1930, to $485,500.87 on December 20, 1930. On December 20, however, another run began and the bank was compelled to close. The Comptroller of the Currency, on December 23, 1930, announced its insolvency and appointed H. J. Spurway as receiver. The depositors at the time of closing numbered some 5,700, and were owed $5,996,970.02. They have since received liquidating dividends totalling 40 per cent.

■ The parties have been at variance as to the respective weight to be accorded to the two lengthy findings of fact now before us, the master's and the district court's respectively. While it is the master's findings of fact which are to be accepted "unless clearly erroneous," Federal Rules of Civil Procedure, rule 53(e) (2), 28 U.S.C.A. following section 723c, and the question is the same in this court as it was in the district court, Morris Plan Industrial Bank v. Henderson, 2 Cir., 131 F.2d 975, yet for the most part we find it unnecessary to direct our attention to these differences between the tribunals below. In the main, there is agreement on the basic facts, and dispute only as to the conclusions and inferences to be drawn from them and the legal principles applicable. As will appear, we differ from both the master and the district court as to certain of these conclusions and principles. The master's recommendation of dismissal was based upon his view that as to all losses but one for which de-

fendant was claimed to be responsible, liability was not proved, and that as to the one proved, recovery was barred by the statute of limitations. On the other hand, the district court found the statute of limitations not a bar, and, while finding liability for a considerable number of specific losses —though not to the extent claimed by plaintiffs—also ruled alternatively that defendant was generally responsible for the bank's losses, by reason of his designation of dummy directors for the bank. Defendant, in addition to his defense of the statute of limitations and his contentions that the specific losses in issue were for the most part not the result of improper banking practices, relies also on his lack of knowledge of each transaction. We shall, therefore, discuss first the general issues of the statute of limitations and of the standard of responsibility by which defendant's conduct is to be judged, and shall then consider each specific transaction which is in dispute.

Defendant points out that he and his corporation, Penney-Gwinn, by this bank's failure, have lost very large sums of money which from his point of view and in substantial effect were donations made to the bank to keep it running, in the interest of the depositors, without personal gain of any kind, whether by way of dividends or otherwise. Moreover, it is a fact that the claims against him are not based upon intentional or wilful wrongdoing, but rest in final analysis on his inattention to duty. The picture of the bank disclosed by the record is that of a comparatively small institution, which during its brief existence engaged in a continuing struggle against the deepening gloom of the Florida real estate depression. Hindsight suggests that it was doomed from the beginning. Nevertheless, certain of the losses should never have been incurred. One cannot be a national bank director in absentia, and we cannot condone defendant's failure to attend to the duties of an office voluntarily accepted or relieve him of responsibility for losses to the avoidance of which he should have devoted his best thought and endeavor.

■ 1. Statute of Limitations. The appropriate statute of limitations is the New York Civil Practice Act, § 49(4), limiting to three years actions against bank directors to enforce a liability created by the common law or by statute and providing that the "cause of action is not deemed to have accrued until the discovery by the

plaintiff of the facts under which * * * the liability was created." Platt v. Wilmot, 193 U.S. 602, 24 S.Ct. 542, 48 L.Ed. 809; Russell v. Todd, 309 U.S. 280, 290–294, 60 S.Ct. 527, 532–534, 84 L.Ed. 754. It seems that under this statute the bank is the plaintiff and the complainant depositors are considered to bring the suit on its behalf. Mencher v. Richards, 256 App.Div. 280, 9 N.Y.S.2d 990; Chance v. Guaranty Trust Co. of New York, 257 App.Div. 1006, 13 N.Y.S.2d 785, affirmed 173 Misc. 754, 20 N.Y.S.2d 635, affirmed 282 N.Y. 656, 26 N.E.2d 802; Van Schaick v. Aron, 170 Misc. 520, 10 N.Y.S.2d 550; Hifler v. Calmac Oil & Gas Corp., Sup., 10 N.Y.S.2d 531, affirmed 258 App.Div. 78, 16 N.Y.S.2d 104; Van Schaick v. Cronin, 237 App.Div. 7, 260 N.Y.S. 685; see Limitation of Actions in New York in Stockholders' Derivative Suits Against Directors, 54 Harv.L.Rev. 1040, 1044; The Statute of Limitations in Suits to Remedy Corporate Abuse, 41 Col.L.Rev. 686, 694.[1]

An original bill of complaint alleging both fraud and deceit and misfeasance and nonfeasance in office was filed by plaintiffs on December 13, 1933. It was dismissed for misjoinder of legal and equitable causes of action, with leave to serve an amended bill of complaint. Michelsen v. Penney, D.C.S.D.N.Y., 10 F.Supp. 537. On August 31, 1934, an amended bill for this action was served. Shortly thereafter Bancroft, who had succeeded Spurway as receiver in April, was allowed to intervene. Still later, in May, 1935, the court permitted plaintiffs to file a supplementary and amended complaint which prayed for judgment to the receiver, Bancroft; and this he completely and promptly accepted as the basis of his own prayer to the same effect.

The original bill first alleged without particulars that a total loss of $3,000,000 suffered by the bank and otherwise unaccounted for had been occasioned by defendant's negligence and violation of the National Bank Acts, "as hereinafter more particularly set forth and otherwise," and then specifically complained of certain transactions involving City National Building, Inc., Coral Gables, Inc., and preferential payments to defendant. The amended bill elaborated "otherwise" to "in other manners and by other means peculiarly within the knowledge of the defendant, James C. Penney, and wholly unknown to the plaintiffs." The supplemental and amended complaint, filed after motions made by defendant and covering forty-five printed pages, set forth with more detail than the present federal rules contemplate not only the transactions particularly described before, but also others allegedly contributing to the $3,000,000 bank deficit and occasioned by defendant's negligence and violation of statutory obligations.

Defendant contends that the statutory period should be reckoned from the date the alleged wrongs were committed against the bank—in every instance prior to December 13, 1930—and that, therefore, even the original complaint is barred. He contends, further, that even if the prescriptive period is reckoned from the date of the appointment of a receiver, at least the supplementary and amended complaint is barred.

■■ Under the general rule, to which New York has apparently adhered, notwithstanding the provision that the cause accrues only upon discovery of the facts, the prescriptive period ordinarily runs from the time alleged wrongs are committed. Chance v. Guaranty Trust Co. of New York, supra; see The Statute of Limitations in Stockholders' Derivative Suits Against Directors, 39 Col.L.Rev. 842, 852. But the statute is tolled while a corporate plaintiff continues under the domination of the wrongdoers. See The Statute of Limitations in Stockholders' Derivative Suits Against Directors, 39 Col.L.Rev. 842, 854. Here there is no dispute of the district court's finding that "at all times during the existence of City National Bank in Miami the defendant Penney through his agents

---

[1] Doubt has been expressed in the articles cited whether this is true in all cases. Thus, the word "plaintiff" in § 49(4) might be held to contemplate the person actually instigating suit, and the phrase "person aggrieved" in the companion provision of § 49(3), dealing with suits for penalties and forfeitures, to designate the derivative party. Cf. Fleishhacker v. Blum, 9 Cir., 109 F.2d 543, certiorari denied 311 U.S. 665, 61 S.Ct. 23, 85 L.Ed. 427. Significantly § 48(5), which concerns suits for fraud, starts the statutory period running upon discovery by "the plaintiff, or the person under whom he claims." But there seems no reason why we should not here take the statements of the New York cases at their face value; moreover, as stated below, neither view will save defendant.

and improperly qualified directors dominated and controlled said bank, its directors and its officers." So, at the earliest, the three-year period began to run from the date of the appointment of Receiver Spurway, December 23, 1930. Then defendant's domination of the bank ceased and notice of defendant's wrongs for the first time became imputable to the bank.[2] Accordingly, § 49(4) is no bar to the original and amended complaints.

■■■ Discovery of the facts, must, however, be attributed to plaintiffs as of that time. That the receiver may have kept his mind closed to any actual knowledge of the wrongs and refused to institute suit upon plaintiffs' request was immaterial. Since in fact he was given sufficient notice to put him on inquiry of the wrongs to the bank and he failed to inquire, he was charged with discovery, Wood v. Carpenter, 101 U.S. 135, 25 L.Ed. 807; Higgins v. Crouse, 147 N.Y. 411, 42 N.E. 6, 70 N.Y. St.Rep. 50, and through him the bank, the "plaintiff," was charged. And further it would avail the depositors nothing on this score to consider them the plaintiffs within § 49(4).[3] The receiver was their representative, as well as the representative of the stockholders. See Loughman v. Pitz, D.C.E.D.N.Y., 36 F.Supp. 302, 305; 16 Fletcher, Cyc.Corp., 1931, 343, 379. Hence the general principles imputing knowledge from the agency relationship apply. Of course, had there been collusion between the receiver and the defendant the statute of limitations might have been tolled. Cf. Baker v. Schofield, 243 U.S. 114, 37 S.Ct. 333, 61 L.Ed. 626. But the district court found that the receiver was merely remiss in his duties in failing to bring suit, and there appears to be no occasion for disturbing that finding.

■■■ The amended and supplementary complaint is saved, however, by the doctrine of relation back. As a matter of pleading, the original complaint clearly gave defendant notice that he would be held for all acts of negligence. It charged him with negligence generally and with a resultant three-million-dollar loss "as hereinafter more particularly set forth and

---

[2] The degree of domination required to toll the statute has varied. Some courts have held that any change in the membership of a corporate directorate which brings in new and independent directors places the corporation on constructive notice of the past wrongs of other directors and starts the statute of limitations running against it, even though a guilty majority retains control. Curtis v. Connly, 257 U.S. 260, 42 S.Ct. 100, 66 L.Ed. 222; Adams v. Clarke, 9 Cir., 22 F.2d 957; Schilling v. Parman, D.C.Or., 35 F.2d 780; Rankin v. Cooper, C.C.N.D.Ark., 149 F. 1010; Cockrill v. Abeles, 8 Cir., 86 F. 505; National Bank of Commerce of Tacoma, Wash., v. Wade, C.C.Wash., 84 F. 10; cf. White v. Federal Deposit Ins. Corp., 4 Cir., 122 F.2d 770, rehearing denied 124 F.2d 429, certiorari denied 316 U.S. 672, 62 S.Ct. 1043, 86 L.Ed. 1747. Other courts have refused to impute knowledge to the corporation so long as a guilty majority remains in office. Farmer v. Standeven, 10 Cir., 93 F.2d 959; McNair v. Burt, 5 Cir., 68 F.2d 814; Payne v. Ostrus, 8 Cir., 50 F.2d 1039, 77 A.L.R. 531; Hughes v. Reed, 10 Cir., 46 F.2d 435; Anderson v. Gailey, D.C.N.D.Ga., 33 F.2d 589. The New York decisions have not consistently followed any one view. Mencher v. Richards, 256 App.Div. 280, 9 N.Y.S.2d 990 (knowledge not imputed regardless); Hifler v. Calmac Oil & Gas Corp., Sup., 10 N.Y.S.2d 531, affirmed 258 App.Div. 78, 16 N.Y.S.2d 104 (knowledge not imputed where wrongdoer controlled directors); Chance v. Guaranty Trust Co. of New York, 257 App.Div. 1006, 13 N.Y.S.2d 785, affirmed 173 Misc. 754, 20 N.Y.S.2d 635, affirmed 282 N.Y. 656, 26 N.E.2d 802 (knowledge imputed although wrongdoers retained control); Van Schaick v. Aron, 170 Misc. 520, 10 N.Y.S.2d 550 (knowledge imputed where some new and independent directors were elected). Here even under the strict view and though there were some nine changes in board membership during the life of the bank, notice should not be imputed to the bank, because all these new directors were elected by the controlling Penney group, many of them were lent qualifying shares by this group, and none of them were ever independent in any real sense.

[3] Plaintiffs' argument that their right of action did not accrue until demand upon the first receiver to sue cannot be accepted. Demand is sometimes a limitation upon their right to sue, Lucking v. Delano, 6 Cir., 117 F.2d 159; but it certainly cannot be used as a device to extend their time to sue where they are asserting the same right as the receiver, their representative, might have asserted. Cf. Loughman v. Town of Pelham, 2 Cir., 126 F.2d 714; N.Y.Civil Practice Act § 15. The analogy of this action to a stockholders' derivative suit where the directors in good faith fail to act seems complete.

otherwise." The amended complaint elaborated upon this, alleging that the loss was occasioned by means known only to defendant. Certain acts of negligence were specified. But these did not anywhere near account for the total loss, and defendant was bound to realize that he would be held for every possible act of mismanagement. Cf. New York Cent. & H. R. R. Co. v. Kinney, 260 U.S. 340, 43 S.Ct. 122, 67 L.Ed. 294.[4] The amended and supplementary complaint merely made specific what had already been alleged generally; the cause of action was not changed; and relation back under Federal Rules of Civil Procedure, rule 15(c), and the earlier law it codifies, therefore followed. Maty v. Grasselli Chem. Co., 303 U.S. 197, 58 S.Ct. 507, 82 L.Ed. 745; United States v. Memphis Cotton Oil Co., 288 U.S. 62, 53 S.Ct. 278, 77 L.Ed. 619; Glint Factors v. Schnapp, 2 Cir., 126 F.2d 207; International Ladies' Garment Workers' Union v. Donnelly Garment Co., 8 Cir., 121 F.2d 561; 1 Moore's Federal Practice 789–803, 810; 2 Federal Rules Service 653; 5 Federal Rules Service 815; and see, also, Elliott v. Mosgrove, 162 Or. 507, 540, 91 P.2d 852, 93 P.2d 1070; Original Ballet Russe, Ltd. v. Ballet Theatre, Inc., 2 Cir., 133 F.2d 187.

2. Basis of Defendant's Liability. This case has developed the most divergent views as to the standard of liability by which defendant's conduct as a bank director must be judged. They range from plaintiffs' contention, which was adopted by the district court as its first ground of decision, that defendant was liable as an insurer for bank losses because of his acts in enabling certain directors to qualify without bona fide ownership of stock, to defendant's claim, substantially adopted by the master, that though he might be held for common-law negligence, yet he was not liable for any losses resulting from statutory violations, since he did not "knowingly" participate in or permit them. Since defendant was unwilling to concede proof of negligence, except as to a single claim (which he contended to be barred by the statute of limitations), his view of the law would pretty much protect him from responsibility for the losses.

■ All concede that under the authorities there are two bases of liability—one at common law for failure to exercise that degree of care which ordinarily diligent and prudent men would exercise under the circumstances, Bowerman v. Hamner, 250 U.S. 504, 513, 39 S.Ct. 549, 63 L. Ed. 1113, and one under the National Bank Act. By 12 U.S.C.A. § 93, substantially unchanged from the original Act of 1864, 13 Stat. 99, 116, it is provided that directors who "shall knowingly violate, or knowingly permit" any of the bank's officers or agents to violate any provisions of the Act shall be personally liable for all damages which the bank, its shareholders, or any other person, shall have sustained "in consequence of such violation."[5]

[4] Since this is a matter of federal pleading, that is, of what is fair notice from the complaint, Clark, Code Pleading, 1928, 75, 83, 513, state precedents are not controlling. But there is nothing to indicate that the New York cases upon which defendant strongly relies would lead to a different result. Cases such as Goldstein v. Tri-Continental Corp., 282 N.Y. 21, 24 N.E.2d 728, and Winkelman v. General Motors Corp., D.C.S.D.N.Y., 44 F.Supp. 960, 1018, are those where new and independent acts were asserted beyond the period of limitations. Harriss v. Tams, 258 N.Y. 229, 179 N.E. 476, actually supports relation back here; while Lehman, J., refused an amendment of a cause of action grounded on an agent's failure to deliver a boat "in accordance with representations" to include the agent's breach of a warranty of authority to make representations for his principal, he did say that an amendment to claim a breach of contract to deliver a boat with a specified speed would be permissible.

[5] R.S. § 5239, 12 U.S.C.A. § 93: "If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this chapter, all the rights, privileges, and franchises of the association shall be thereby forfeited. Such violation shall, however, be determined and adjudged by a proper district, or Territorial court of the United States, in a suit brought for that purpose by the Comptroller of the Currency, in his own name, before the association shall be declared dissolved. And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation." A similar provision applies to violations of the Federal Reserve Act of 1913, 12 U.S.C.A. § 501a, note 7, infra.

418

In Yates v. Jones National Bank, 206 U.S. 158, 180, 27 S.Ct. 638, 645, 51 L.Ed. 1002, it was said that for a liability resting on the statute "proof of something more than negligence is required; that is, that the violation must in effect be intentional." The decision in Thomas v. Taylor, 224 U.S. 73, 82, 32 S.Ct. 403, 405, 56 L.Ed. 673, added the qualification: "There is 'in effect' an intentional violation of a statute when one deliberately refuses to examine that which it is his duty to examine." This qualification has since been repeated as a part of the rule. Jones National Bank v. Yates, 240 U.S. 541, 36 S.Ct. 429, 60 L.Ed. 788; Corsicana National Bank v. Johnson, 251 U.S. 68, 71, 40 S.Ct. 82, 64 L.Ed. 141; Federal Deposit Ins. Corp. v. Mason, 3 Cir., 115 F.2d 548, 550. More recently the court has limited earlier decisions to hold that a defense of estoppel which a director might have against the bank as to a violation of the Act will not be good as against the receiver, saying that "it is the evil tendency of the prohibited acts at which the statute is aimed, and its aid, in condemnation of them, and in preventing the consequences which the Act was designed to prevent, may be invoked by the receiver representing the creditors for whose benefit the statute was enacted." Deitrick v. Greaney, 309 U.S. 190, 198, 60 S.Ct. 480, 484, 84 L.Ed. 694.

In the Bowerman case the Court had occasion to define the common-law duty of a bank director. In that case Bowerman, who lived 200 miles away from the bank, had never attended a directors' meeting or examined any of the books or papers of the bank. The Court said it was "beyond discussion" that he "did not exercise the diligence which prudent men would usually exercise in ascertaining the condition of the business of the bank, or a reasonable control and supervision over its affairs and officers. * * * He cannot be shielded from liability because of want of knowledge of wrongdoing on his part, since that ignorance was the result of gross inattention in the discharge of his voluntarily assumed and sworn duty." 250 U.S. at page 513, 39 S.Ct. at page 552, 63 L.Ed. at page 1119.

 The similarity of that case to the case at bar is striking. Here the master and the court were in agreement as to not merely defendant's utter incompetence, but also his complete neglect of duty, as a bank director. He had no special knowl-

edge or experience for the position, and not only did nothing to fit himself for it, but failed in the obvious duties of attendance at meetings of the Board of which he was chairman. Of thirty-one regular and special meetings of the Board during his directorship, he attended only three—two in 1928 and one in 1930. He also attended a meeting of the Loan and Discount Committee in 1930. His excuses of ill health on the part of himself and his wife were properly discounted—especially in the light of his other manifold activities. And at most they should have led him to resign, not to continue in a relation which would mislead the public. See Rankin v. Cooper, C.C.W.D.Ark., 149 F. 1010, 1016. As the master said, with the court's concurrence, "The conclusion is inescapable that defendant Penney treated the bank's business as of secondary consequence." 41 F.Supp. at page 616. But "his oath forbade his abandoning the conduct of the business to" the other bank officers. See L. Hand, J., in Goess v. Ehret, 2 Cir., 85 F.2d 109, 110. Indeed, defendant concedes his liability for the Board's negligence, for he says in his brief that "save as the Statute of Limitations affords a defense, appellant Penney does not dispute his liability if negligent acts of the Board are shown to have caused damage to the bank."

This concession of defendant loses substantially the greater part of its effect when it is coupled with the contention that any act of the Board which violates the National Bank Act is subject to the exclusive remedy contained in the statute, which in turn shields him from liability because of his lack of knowledge. As pointed out below, even on so strict a view, he must be charged with a greater knowledge of the bank's affairs than this contention admits; but we do not believe it is a correct, or at least a complete, statement of the appropriate standard. Its logical conclusion would be that as proper banking practices come more and more—in accordance with present trends—to be the subject of statutory enactment, a director inattentive to duty will secure greater and greater exemption from liability. Thus, the scope of the Bowerman rule would be small and would be constantly decreasing. Actually, as the decision below makes additionally clear, McCormick v. King, 9 Cir., 241 F. 737, losses for which Bowerman and other bank officers were held were in violation of the Act (now 12 U.S.C.A. § 84); but

that did not prevent an assessment of a liability more extensive than the statute against them. The principle is also made clear in the case against the directors of the National Bank of Kentucky. In Atherton v. Anderson, 6 Cir., 86 F.2d 518, the circuit court of appeals conceived itself limited to a consideration of losses due to statutory violations, not to common-law negligence, since the receiver had not appealed from a decree generally favorable to him. Hence it reversed the greater part of the recovery allowed below. But the Supreme Court held that the court should have considered the common-law grounds, 302 U.S. 643, 58 S.Ct. 53, 82 L.Ed. 500. Hence on rehearing the circuit court granted most of the recovery allowed below, finding common-law negligence both in cases specifically covered by statute and in cases not so covered. Atherton v. Anderson, 6 Cir., 99 F.2d 883. It should be noted that in that case, as well as in Federal Deposit Ins. Corp. v. Mason, supra, the directors' inattention to duty was not so gross as that of defendant here.

In the light of this trend towards increasing responsibility of bank fiduciaries, we do not think we are justified in holding that the statutes extend the area of protection accorded a director. It is true, as it is appropriate, that a director conscientiously carrying out the duties of his office cannot be held for statutory violations of which he neither has nor should have knowledge. There the statute is the only measure of responsibility. But where he has substantially abdicated the responsibilities of his office, then the common-law principle—which is in addition to the statutory rules—operates to make him liable for losses improperly incurred by his co-officers to whom he has abandoned the operation of the bank. In fixing those losses, there seems no reason why the statutory standards should not have their ordinary function in determining what are allowable and what are prohibited bank practices. We may say, in accordance with the usual rule, Restatement, Torts, §§ 285, 286, that a legislative enactment, made for the benefit of persons suffering loss, of a standard of due care is to be considered a controlling test of negligence. Or even if it is thought necessary to couch the result in terms of the qualification of the statutory remedy as interpreted by the Supreme Court cases cited above, we may conclude, at least as to the type of matters which we have before us in this case, that there is "in effect" an intentional violation of the appropriate requirements by a deliberate refusal to investigate that which was defendant's duty to investigate. On either rationale, defendant is to be held liable for the losses improperly incurred by his colleagues in the bank.

Each standard of liability still requires, however, a causal connection between the act interdicted and the loss. It is because of that requirement that we do not agree with the district court in holding defendant as an insurer by reason of the qualification of dummy directors. That there was a violation of statute seems clear. 12 U.S.C.A. § 72 requires every director of a bank such as this to "own in his own right" shares of the bank's capital stock of which the aggregate par value shall not be less than $1,000, and provides that a director ceasing to own the required shares "shall thereby vacate his place." To all intents and purposes, Penney-Gwinn was the substantial owner of the stock who had supplied the money and who took the risk of loss; indeed, Penney-Gwinn ultimately paid the assessment levied on these shares of stock. But that violation of itself does not show loss to the bank. It was not shown, for example, that irresponsible or untrustworthy men were placed on the Board and that they proceeded forthwith to loot the bank's exchequer. On the contrary, the evidence supports the conclusion that the directors were all known and esteemed business men. Conceivably there may arise cases where specific losses can be traced to a violation of this statute, but that is not the present case.

Stress is placed upon the word "thereby" in the statutory command that an unqualified director shall vacate his office. But the statute does not show a clear intent to declare the office vacant on the mere happening of the disqualifying condition; and the case of Briggs v. Spaulding, 141 U.S. 132, 152, 11 S.Ct. 924, 35 L.Ed. 662, 670, suggests the contrary in its careful examination of the effect of an oral resignation of a director who had surrendered his stock. See the same case below, Movius v. Lee, C.C.N.D.N.Y., 30 F. 298, 301. And even if automatic vacation of office should have resulted, or even if the number of directors fell below the statutory requirement of five, 12 U.S.C.A. § 71, it is not apparent why an insurer's liability would then result. The very lack

of effective means of enforcing proper qualifications of directors may have been the reason for the passage in 1933 of provisions for the appointment of a receiver by the Comptroller of the Currency, 12 U.S.C.A. § 71a, and for removal of a director by the Board of Governors of the Federal Reserve System upon certification by the Comptroller of continuous violation of law. 12 U.S.C.A. § 77. Now at least means of control are adequate. At any rate, the violent remedy of holding directors as insurers of their bank's success for breaches of the requirements for their qualification which are not shown to have caused loss seems of the kind which would defeat its own purpose by making prudent and responsible men loath to accept directorates, to the community's loss in lack of men of caliber for these positions of trust. Cf. Yates v. Jones Nat. Bank, supra, 206 U.S. at page 179, 27 S.Ct. 638, 51 L.Ed. 1002.

It may be added that if general liability were to be assessed because of this situation, it would be difficult to know where to begin and even more where to leave off in computing damage. If liability exists beyond that for the specific acts which we are about to examine, there would seem no stopping point short of complete responsibility for all disappointed expectations in the bank, even those of stockholders for at least principal, if not for profits. In this, regard plaintiffs' actual contention is not overclear. Their most explicit statements are to be found in their respective notices of appeal, where they claim for violation of § 72 the "losses and damages sustained by the City National Bank in Miami and the amount of" the bank's obligations outstanding when it failed, with interest, but less liquidating dividends. The use of "and" here is confusing, for obviously they cannot expect to add together both all losses and all unpaid obligations. Probably "in" is meant, and the claim is intended to be for the amount, less stockholders' claims, for which the bank failed. But this, too, is an illogical stopping point, leaving possibly negligent losses unchallenged. Or if all losses are claimed, even on proper, but unfortunate, loans, then the bank would enjoy a guaranty so unusual that it would be immune from the normal losses which must come to even a well-run bank. It is significant that the district court in last analysis did not go as far as its first conclusion seemed to carry it. Actually it

allowed recovery on this ground only for the losses it had otherwise found due upon a careful analysis of each specific claim. Indeed, except for plaintiffs' extreme claim, the issue tends to be academic; for we see no formula less than that which would cause us to change the conclusions we are reaching in all the specific matters brought before us on these appeals. And, we might add, this would still be true if the basis of the formula is stated in terms of an increased burden of proof upon defendant; the instances where we deny recovery are those where upon all the evidence we find the directors' actions not improper.

We therefore reject any claim for damage beyond that sustained in the specific matters we now discuss.

■ 3. The City National Building Transactions. Liability is asserted against defendant on two counts in connection with City National Building, Inc.—one for alleged negligence in improvidently investing the bank's money in preferred stock of City National Building, Inc., the other for alleged negligence in unnecessarily paying City National Building, Inc., an excessive rent for the bank's premises. The two acts arise from the same set of transactions, as follows:

In 1925, Miami Bank and Trust Company, wishing to obtain its own banking premises, organized Miami Stockholders Company. It distributed the capital stock of the latter to its own stockholders and then proceeded to lend the company $450,000 to acquire the desired property, taking back a note of an equivalent amount, secured by a purchase-money mortgage on the property. The funds for a new building to be erected on the property were supplied by a bond issue of $650,000, secured by a first mortgage upon the entire property superior to the bank's purchase-money mortgage. The bank took a ten-year lease covering the ground floors in the new building at a rental of $36,000 per year. Pursuant to a provision in the lease that the lessor would rent to the bank additional space in the ten-story building, the bank also took possession of the second floor without, however, executing any new lease, agreement, or instrument in writing. It paid an annual rental of $17,000 for the space.

In June, 1926, City National Bank and Trust Company of Miami acquired the assets of the Miami Bank, succeeding both

to the lease and to the second mortgage of $435,000. It also took over a note of Miami Stockholders for $120,250, secured by a second mortgage on property known as the Prince Edward Apartments.

When City National Bank and Trust Company of Miami merged with the City National Bank in Miami in February, 1928, the notes, the mortgages, and the lease again changed hands. At this time the first mortgage on the Prince Edward Apartments had been foreclosed, and the interest of the second mortgagee wiped out. The second mortgage on the bank premises was also in default; and in March, 1928, City National Bank began a foreclosure proceeding. This was not pressed, however, but by agreement which became effective by May 8, 1928, City National Building, Inc., was organized with 13,000 shares of $100 par value preferred stock and with 100 shares of common stock, 51 per cent of which was distributed to City National Bank, and 49 per cent to Miami Stockholders. Miami Stockholders transferred its equity in the bank premises to City National Building, Inc., and City National Bank exchanged the notes and mortgages which it held against Miami Stockholders for an equivalent par value of preferred stock. Thus far City National Bank had lost nothing. Stock of doubtful or no value had been merely substituted for notes of like value.

But underlying these financial manipulations was the assumption that City National Bank should itself pay off the first mortgage on the bank premises, taking in satisfaction additional preferred stock of City National Building, Inc. At this time, $647,000 was still owed on the mortgage, $77,000 being due immediately. Accordingly, at the outset, the bank paid $77,000 to the trustee of the mortgage and subsequently, until it failed, paid $108,000 more on the mortgage and $58,000 for another new building—a grand total of $243,000—in satisfaction of which preferred stock at par was received. There has been a recoupment upon this stock of only $17,320.30. A loss of $225,679.70 was thus incurred.

In addition, City National Bank, after taking over the banking headquarters of City National Bank and Trust Company, continued to pay the annual rental of $53,000 which the Miami Bank first undertook to pay, and which City National Bank and Trust Company had assumed to pay under its assignment of the lease. This occurred notwithstanding the fact that both Miami Stockholders and the directors of City National Bank had contemplated, and urged upon the Comptroller of the Currency as a basis for his approval of this project, that the bank through its stock control of City National Building, Inc., would cancel the old lease and execute another at a fair annual rental of $20,000. Thus, the bank paid an excessive rent of $33,000 per year throughout its life, sustaining a loss of $88,000.04.

The master and the district court agreed that the directors, including defendant, were negligent in that they acquired title to the bank premises through City National Building, Inc., without obtaining an appraisal of the property and upon the assumption that its value was still the equivalent of its cost at the height of the Florida real estate boom. The district court found that "an honest appraisal obtained at the time would have shown the building worth much less than the principal amount of the first mortgage," also that "had a competent examining committee appointed as provided by the by-laws and as directed by the National Bank Examiner properly functioned, such a committee, in evaluating the assets of the bank, would have found that the property, free and clear of all encumbrances, was not worth more than $400,000." And the master agreed that $400,000 was the fair market value of the land and bank building in May, 1928.

Some of the directors holding office at the time testified that they judged the property was worth upward of a million dollars; but it appeared that in many cases these estimates were based not on what the directors thought the building would be worth on the market, but on what they felt it was worth to the bank. But a finding of the master, in which the district court concurred, rejected any good-will value: "The bank had occupied its then quarters less than two years. The Flagler Street end of the building was by all accounts ramshackle and a wooden fire-trap. The failure of banks in the neighboring business section made other sites available. It is impossible to believe that the bank would have sustained any loss of goodwill in moving to one of them." Furthermore, it appeared that, while some of the directors questioned the acquisition of the property on the ground that "it would not pay," no disinterested appraisal was ever sought.

The directors blindly voted to expend $647,000 to take over a first mortgage on property fairly appraised at little more than $400,000.

The master nevertheless held that the directors incurred no liability for this action because, while their failure to investigate was undoubtedly negligent, even had they investigated they might reasonably have foreseen no harm to the bank from the acquisition. He reasoned that the bank was liable on the original lease to pay an annual rental of $53,000 for the balance of its term—some seven and one-half years—and that this was $33,000 more than a fair annual rental for the property. By adding the total excessive rent of $247,000, which would have to be paid over the balance of the lease term, to the fair market value of the building, based on a fair economic rent, the property could be accorded a value of $647,000.

This rationale can only be made applicable, however, by a process of over-simplification whereby the intervening landlord-mortgagor drops out, and the bank in effect buys for $647,000 the building and the burdensome lease against it, which it is further assumed the first mortgagee can enforce. Clearly as to the financially irresponsible Miami Stockholders the rationale will not suffice. It owed the bank a total of overdue indebtedness of $555,250—$435,000 secured by the second mortgage on the bank building, and $120,250 secured by the second mortgage already determined to be worthless on the Prince Edward Apartments. Faced with this overwhelming claim, it was practically in no position to oppose the bank's demand for a new lease at a reasonable rental which would eliminate the abnormal increment of value attributed to the property. The bank could have foreclosed this interest, as it had already started to do, or use it otherwise to secure appropriate adjustments. True, Miami Stockholders made some attack on the bank's title to those mortgages; but this obviously could have been at most a bargaining point, for the debts were certainly validly owed at least to the old Miami Bank and Trust Company, which City National Bank then represented.

As to the first mortgagee (the trustee for the bondholders), even accepting the master's premise that he could enforce the lease throughout its terms, it is doubtful whether the transaction should be considered a reasonable purchase in view of its obvious purpose and the various complications which it involved. The rather clear-cut proposition of the master was never visualized or considered by the directors. In fact, it only came into the case when it was propounded by the master in his draft opinion in 1939 after the hearings were closed and arguments had. It seems clear that the real purpose behind the complicated setup of the newly organized City National Building, Inc., was to avoid the immediate crisis by another palliative which would (a) substitute new securities (preferred stock) for the overdue indebtedness criticized by the bank examiner and (b) preserve the speculative position of all concerned in the bank office building, even though the offices were only half rented and despite the fact that the Miami real estate boom had burst and the bank was already gorged with real estate. The evidence in fact gives rise to an implication that the bank was influenced to favor Miami Stockholders by an active interlocking directorate. The master found, and the court agreed, as to Miami Stockholders that, while they had contributed nothing to the enterprise, "their vociferousness, all out of proportion to their interest in the property, to retain a speculative interest in the building, should not have been treated by the directors as an important circumstance. Particularly is this so when the most outspoken were officers and directors of the bank, whose actions were, therefore, subject to the more careful scrutiny." And he found it impossible that the directors could have believed the building then worth its cost. It is to be further noted that Saunders, officer and director of the bank and resident manager of Penney-Gwinn, who actively promoted this plan before the board, became president of the Building Company.

Furthermore, the transaction left Miami Stockholders still in the picture, together with the new corporation, City National Building, both of which would require moneysops, even if the venture ultimately proved speculatively successful. As it actually turned out, the bank continued to pay a rental of $53,000 a year, although apparently all the negotiators had contemplated its reduction to $20,000. This otherwise inexplicable result was presumably due to the uncalculated needs of City National Building arising from the bank premises. In other words, this was an indirect and a potentially expensive way to accomplish

what the master thought would have been permissible.

But the premise that the first mortgagee could enforce the lease for its full term against the bank is, we think, not sound. There are initial problems, not made clear on this record or in the briefs, as to whether City National Bank can be held originally to have assumed the lease (which at the time of its organization was actually held by the trustee of the "pool loan" as security for that loan), and whether that part of the rent based on the oral agreement for the occupancy of extra rooms—$17,000 per year—can be included in any event. Passing these questions, the master relied on the pledge of the rents. The first mortgage contained a provision conveying not merely the land and fixtures, but "also all the hereditaments, rents, issues and profits now or hereafter belonging to, and all the right, title and interest of said parties of the First Part in and to all leaseholds, leases and subleases now or hereafter on or to said real estate." Other provisions gave the mortgagor possession and use of the property "and the income, rents, issues and profits thereof" until default. Upon default, the trustee (mortgagee) could take possession directly or through a receiver, and the mortgagor agreed upon demand to furnish proper assignments of all leases or subleases.

It may well be argued, however, that with or without these provisions, the mortgagor, until the mortgagee takes possession, is entitled to the rents and is in charge of the premises to make proper contracts as to their use. Smith v. D. A. Schulte, Inc., 2 Cir., 91 F.2d 732, certiorari denied 302 U.S. 744, 58 S.Ct. 145, 82 L.Ed. 575; In re Humeston, 2 Cir., 83 F.2d 187, 189; Prudential Ins. Co. of America v. Liberdar Holding Corp., 2 Cir., 74 F.2d 50; Freedman's Savings & Trust Co. v. Shepherd, 127 U.S. 494, 8 S.Ct. 1250, 32 L.Ed. 163. See, also, White v. Anthony Investment Co., 119 Fla. 108, 160 So. 881; Carolina Portland Cement Co. v. Baumgartner, 99 Fla. 987, 128 So. 241; Pasco v. Gamble, 15 Fla. 562. Accordingly the mortgagor and the lessee might be at liberty to draw up a new lease, so long as no fraud is contemplated. Haussmann v. Colonial Trust Co., 254 App. Div. 480, 5 N.Y.S.2d 344, affirmed

280 N.Y. 577, 20 N.E.2d 24; Id., D.C.S.D. N.Y., 23 F.Supp. 213; Prudence Co. v. 160 West Seventy-Third St. Corp., 260 N.Y. 205, 183 N.E. 365, 86 A.L.R. 361; Bank for Sav. v. Shenk Realty & Constr. Co., 265 App.Div. 72, 37 N.Y.S.2d 597; Fahnestock v. Clark Henry Corp., 151 Misc. 593, 272 N.Y.S. 49; cf. Bank of Manhattan Trust Co. v. 571 Park Ave. Corp., 263 N.Y. 57, 188 N.E. 156. And where the new lease is for the reasonable value of the premises and the mortgagee has not started proceedings, it has been suggested unlikely that any fraud exists or can be discovered. See 4 U. of Chi. L. Rev. 504. Furthermore, it seems clear that here the bank as second mortgagee could have foreclosed and thus gotten rid of all but an obligation to pay for reasonable occupancy. Cf. Sears, Roebuck & Co. v. 9 Ave.—31 St. Corp., 274 N.Y. 388, 9 N.E.2d 20. The failure to consult the first mortgagee in any way and the absence of any suggestion that his permission was needed for the important matter of adjusting the rent show how far this was from the contemplation of the bank officers at the time. We think this whole transaction must be considered an unwarranted real estate venture, rather than a proper purchase of the bank premises.

Damages proximately caused by the directors' negligence certainly extend to all payments on or incidental to the first mortgage indebtedness. From what we have just said, it is also amply clear that they should include the unnecessary payment of the excessive rent. We think further that they should include the sum of $58,000 contributed to the erection of the new building in 1929 to replace the old wooden and ramshackle firetrap previously used by the bank. Had the directors originally considered all aspects of the situation, they must reasonably have contemplated that a new building would be required within a few years, and they must have realized that there was no one other than the bank to do the financing. True, they may have contemplated that some space in the building could be leased out, but they must also have realized that income from this source was very uncertain, since there was an oversupply of office buildings in the neighborhood at the time.[6] Defendant is accord-

---

[6] The district court held that the erection of the building was a separate act of negligence for which defendant was liable. The master also considered the erection of the building separate and distinct from the acquisition of the first mortgage, but he held that the directors' action was merely an erroneous business judgment.

ingly liable for the total sum of $313,679.74, as found by the district court.

■ Liability cannot, however, be predicated upon a violation of 12 U.S.C.A. § 24, which, during the period involved here, 1928-1930, forbade the purchase of "investment securities" in an amount exceeding 25 per cent of the bank's capital and surplus, and required the observance of certain standards of "marketability" prescribed by the Comptroller of the Currency. "Investment securities" were defined generally by the statute to mean "bonds, notes and/or debentures." We adopt the master's thoughtful analysis that the statute is inapplicable here, for preferred stocks fall without the definition of "investment securities."

■ Prior to 1933, and § 24 was amended expressly to prohibit a bank's purchase of corporate stock for its own account, it was generally held that the purchase of such stock was ultra vires. First Nat. Bank of Charlotte v. National Exch. Bank of Baltimore, 92 U.S. 122, 23 L.Ed. 679; California Bank v. Kennedy, 167 U.S. 362, 17 S.Ct. 831, 42 L.Ed. 198; Concord First Nat. Bank v. Hawkins, 174 U.S. 364, 19 S.Ct. 739, 43 L.Ed. 1007; First Nat. Bank of Ottawa v. Converse, 200 U.S. 425, 26 S.Ct. 306, 50 L.Ed. 537. But it seems to us, as the master pointed out, that the purchase of preferred stock in this case was authorized by 12 U.S.C.A. § 29, permitting a national bank to "purchase, hold, and convey real estate * * * such as shall be necessary for its accommodation in the transaction of its business." The bank controlled its business quarters through its stock ownership as effectively as though it held a deed of conveyance of the property. And no liability should attach to the directors for adopting this method—even though unusual—of securing title to the premises. Cf. Fourth Nat. Bank of Nashville v. Stahlman, 132 Tenn. 367, 178 S.W. 942, L.R.A.1916A, 568.

■ 4. The Coral Gables Transaction. Coral Gables Corporation was a land development company which purchased various exclusively residential tracts just outside Miami, financing each purchase by the issuance of a series of bonds. These bonds were secured by a trust mortgage constituting a first lien, subject to taxes, upon the tract acquired. The corporation sold lots on the installment plan, and in fact pledged many of the purchase-money contracts to secure additional needed funds. When a purchaser paid the last installment upon a lot, he became entitled to a deed conveying it free of the mortgage. But because the corporation failed to account strictly for the proceeds from the pledges, it was forced to give purchasers of some 3,000 lots deeds without release of the mortgage. In 1928, the corporation owed City National Bank $347,929, secured in large part by series bonds, while Merrick, the corporation's president, owed the bank $56,667.78 upon his note for $51,000, secured by worthless collateral. Both Merrick and the corporation had defaulted upon the direct and the collateral obligations; they were financially irresponsible, and an involuntary petition in bankruptcy had been filed against the corporation. Real estate values had declined, and the corporation owed taxes on its property of $3,540,000 as of 1929.

Efforts to reorganize Coral Gables Corporation began as early as February 3, 1928. At a meeting of the bank directors on March 22, 1928, defendant counselled against any action designed to thwart the efforts of the corporation's officials to keep it from receivership and hoped "this bank would lend a helping hand, if only in its attitude." He also told the Board that these officials wished the bank to participate in a contemplated new bond issue of $1,000,000. The directors were at this time inclined to foreclose on the bonds held by the bank; but whether because of defendant's advice or because the estimated costs of foreclosure appeared disproportionately large in comparison with the bank's bond interests, they delayed action.

In the fall of 1928, a plan for the reorganization of the corporation was worked out. Pursuant to it, two new corporations, Coral Gables, Inc., and Coral Gables Properties, Inc., were organized. Coral Gables, Inc., issued debenture stock dollar for dollar in exchange for pledged purchase-money contracts, judgments, and bonds outstanding against the old corporation, and these bonds were transferred to Coral Gables Properties to prevent a merger. Then the old corporation's equity in 8,300 lots was transferred to Coral Gables, Inc., and upon these lots and the purchase-money contracts, the transferee placed a deed of trust to secure $2,000,000 of Class A bonds—to be issued for new money—and $15,000,000 of the debenture stock. The three classes of outstanding securities ranked in order of precedence as follows: Class A bonds,

debenture stock, and bonds held by Coral Gables Properties.

Denham, trustee under the old "pool loan," and Saunders, vice-chairman of the bank's board of directors, at first opposed this plan. One reason, it appears, was their lack of confidence in the proposed management of the new corporations by the officials of Coral Gables Corporation. But after Denham was elected treasurer and chief executive officer of Coral Gables, Inc., at an annual salary of $25,000, and Saunders chairman of its board of directors at an annual salary of $7,500, both withdrew their objections.

Under this plan neither the bank nor any other secured creditor of the old corporation was required to invest in the Class A bonds. An attempted public distribution of the bonds failed, however; and the bank, by action of its Loan and Discount Committee, approved by the directors on April 23, 1929, subscribed to $200,000 of the issue. Coral Gables, Inc., accepted $150,000 cash and the Merrick note for $51,000 in payment of the bank's subscription. Coral Gables, Inc., never redeemed any of the Class A bonds, and the receiver of the bank finally sold its block at a net loss of $139,092.62.

Until the bank purchased Class A bonds, it stood to lose nothing by the plan; and no liability has been asserted against its directors for any acts done prior to that time. Issue has been raised only as to defendant's claim that the purchase of the Class A bonds was also a part of the salvaging operation. If it was not, it violated 12 U.S.C.A. § 24, which requires that "investment securities" be "marketable obligations," under regulations of the Comptroller of the Currency, as admittedly the Class A bonds were not.

Upon the whole evidence we are of the view that defendant's claim cannot be sustained. Before attempting a salvage, bank directors should have a well-founded expectation of a substantially greater recovery than would otherwise be possible, based upon some plan for a quick and expedient disposal of the property salvaged. Compare the Atherton cases, supra, 86 F.2d at page 525, and 99 F.2d at page 887; McBoyle v. Union Nat. Bank, 162 Cal. 277, 122 P. 458. The operation should be devoid of speculation. First Nat. Bank of Ottawa v. Converse, supra. Here the plan of reorganization contemplated a protracted liquidation, which, indeed, was hardly to be differentiated from a permanent continuation of the business under the control of the bank and other creditors. Thus, Class A bonds were to be redeemed from the receipts of land sales over a four-year period, while Class B bonds, issued in place of the debenture stock, were to be redeemed after 1939. Once the debenture stock had all been redeemed and the bonds paid off, the remaining assets of the corporation would belong to Coral Gables Corporation, to which all the common stock of Coral Gables, Inc., had been issued. The directors of the bank at no time contemplated the sale of its holding of bonds and stock. Indeed, public distribution of the bonds had been proved impossible. Under these circumstances at least, the acquisition of bonds and stocks of a substandard quality to be held for a period of five to ten years cannot be considered a reasonable salvage operation. Significant on this point is 12 U.S.C.A. § 83, which permits a bank to acquire its own stock where "necessary to prevent loss upon a debt previously contracted in good faith," *provided a resale is made within six months.* Pertinent, also, is 12 U.S.C.A. § 29, which provides that no national bank shall hold "the possession of any real estate under mortgage, or the title and possession of any real estate purchased to secure any debts due to it, *for a longer period than five years.*"

That Coral Gables, Inc., was a speculative enterprise becomes evident from a review of its financial outlook at the very outset. Pledged to secure Class A bonds, as well as $15,000,000 of debenture stock, were $17,000,000 of accounts receivable, based on purchase-money contracts, and 8,300 unimproved lots. The estimated recovery on the accounts receivable as of the date of the reorganization was $10,000,000. In the past, collection of these accounts had been very slow, a fact of which the directors of the bank had ample notice because of the bank's own meager recovery on purchase-money contracts pledged with it. The 8,300 lots were appraised at $3,005,500, but there was an offsetting tax liability of $3,540,000. Some of these lots were also covered by purchase-money contracts and included in the $17,000,000 of accounts receivable. On the whole, the directors might reasonably have supposed that the security of the trust deed was ample to cover the Class A bonds. But to justify the claim of a salvage operation, there should also have been some reasonable expectation of a substantial recovery

on the old debt over and above what would be otherwise obtainable. The evidence does not afford any grounds for such an expectation. The security of the trust deed did not cover both the debenture stock and the Class A bonds and afford a margin of safety. And the hope that partial recovery on the old debt might be increased could be based only on a speculation that real estate values would rise.

The new corporation furthermore was never adequately financed to enable it to carry out a salvage operation. Only $799,-468.15 in cash was realized from the sale of the Class A bonds and from other credits. Tax claims were compromised in part at $623,694.24 cash. There remained, however, an unsettled tax claim of $1,445,-097.24. It is apparent that from the start the new corporation was left without working capital, and the evidence justifies the conclusion of the district court that "there was no reasonable expectation that * * * the new company would be able to operate with new money of but $799,468.15."

Defendant emphasizes the fact that the bank was the last creditor to subscribe for Class A bonds, being preceded by a number of banks and trust companies. But by then it should have been more evident than ever to the directors that the scheme was doomed. The fact that other banks invested is some evidence of the reasonableness of the operation, but we do not think it can outweigh the public interest against the bank's holding inferior securities in its portfolio for long periods of time.

The directors' purchase of the Class A bonds was, therefore, unjustified. For this, defendant must be held liable for his abdication of his duties as director on the principles stated earlier herein. It is to be noted, further, that even though he was absent from the directors' meeting at which the purchase was authorized, he was in fact a large factor in the bank's involvement in this affair. His advice to the Board in the spring of 1928 to do all in its power to lend Coral Gables Corporation a helping hand, coupled with the fact that he also told the Board then that Mr. Merrick wanted the bank to take a block of a new bond issue contemplated by Coral Gables Corporation, made his assent to the subsequent purchase a foregone conclusion, at least so far as the other directors were concerned. In view of his dominant position in the bank, his attitude was naturally influential with the directors. Cf. Dodd v. Wilkinson, 42 N.J.Eq. 647, 9 A. 685. In fact at this same meeting he promised the Board that he would investigate the Coral Gables situation and report back to it. This he failed to do. By this failure to keep informed, particularly as to a matter upon which he had taken such a definite position, he "in effect" knowingly and intentionally violated 12 U.S.C.A. § 24. Thomas v. Taylor, supra.

5. Loss to Fred H. Rand, Jr. Claim for this loss, due to negligent loans, in the sum of $89,300.39 was disallowed by the master solely on the ground that it was barred by the statute of limitations. Since we have rejected that defense, we agree with the district court in allowing the claim.

■■■ 6. Excess Borrowings by the Bank. From its inception in 1928, City National Bank engaged continuously in borrowings in excess of its capital stock, actually paid in and remaining undiminished by losses, and thus constantly violated 12 U.S.C.A. § 82. When it shut its doors on December 20, 1930, it was indebted for excessive loans in the amount of $1,063,-199.38. Plaintiffs seek to hold defendant liable for $1,050,500.87 of these excessive loans and also for $141,246.45 in interest paid by the bank upon all its excessive borrowings.

The district court allowed the interest, but agreed with the master that the bank was not damaged by the excessive loans. When the bank opened for business in 1928, it owed $3,550,000 upon the inherited "pool loan." Its new capital of $1,000,000 and all other cash which came into its hands were used to reduce this indebtedness. It was accordingly left without working capital and was forced to resort to excessive borrowings, generally from its stockholders. These loans, as both the district court and the master found, were obviously mere substitutes for the old "pool loan"; and, of course, the loans renewing and replacing them also dated back to the "pool loan." The substitutionary character of the borrowings was not altered by the fact that they may not have been used to pay off the "pool loan" directly, but were reloaned to the public. The lending of funds by a bank is one of its essential functions. Whether old debts are paid from working capital, which is then repaired by new borrowings, or whether old debts are paid directly from new borrowings without touching working capital, the result is the same. The total indebtedness of the bank was meanwhile

reduced from $2,965,543.84 on February 10, 1928, to $1,063,199.38 at the closing of the bank. Apparently, then, the bank not only suffered no damages, but, indeed, may have benefited from the directors' action; and defendant could accordingly incur no liability. Payne v. Ostrus, 8 Cir., 50 F.2d 1039, 77 A.L.R. 531; Anderson v. Gailey, D.C.N.D.Ga., 33 F.2d 589; McRoberts v. Spaulding, D.C.S.D.Iowa, 32 F.2d 315.

One finding of the district court, however, has cast some doubt upon the otherwise clear conclusion that the excessive borrowings were all substitutionary. It appears that the excessive borrowings reached an all time low of $726,407.27 on July 24, 1930. The evidence does not show, however, that the increase in excessive borrowings from that time until the bank failed was not in fact of a substitutionary nature, and that the particularly low level of the borrowings on July 24 did not really represent a temporary and abnormal downsweep in an otherwise general decline. The findings of fact, on the contrary, seem to demonstrate that the bank never even partially freed itself of the heavy load imposed upon it by the "pool loan."

Even had this later borrowing been completely unrelated to past transactions, the question would still arise whether liability should follow from a mere showing that the borrowing was used for investments which resulted in losses or whether such investments must themselves have been improper. As we have seen, under either the common law or the statute, 12 U.S.C.A. § 93, supra, recovery may be had only for damage resulting from a statutory violation; and this tends to sustain the former alternative, which would seem to conform to the apparent purpose of the prohibition to provide a capital cushion for depositors against encroachment by general creditors. Weber v. Spokane Nat. Bank, 9 Cir., 64 F. 208. But even so, there may be a question whether temporary excess borrowing to relieve against an immediate embarrassment may not be likened to the salvaging operations which have been held allowable under circumstances we have noted above. Cf. Wyman v. Wallace, 201 U.S. 230, 26 S.Ct. 495, 50 L.Ed. 738; Western Nat. Bank of N. Y. v. Armstrong, 152 U.S. 346, 14 S.Ct. 572, 38 L.Ed. 470. Decision on these points is not necessary here, however, for plaintiffs have not traced any specific losses to investments made with the excessive borrowings.

Absent proof of specific losses, we must assume that the excessive borrowings augmented the bank's total assets by the exact amount of the increase in its liabilities, without prejudice to the depositors. The burden of proof was upon plaintiffs to show the damages sustained by the statutory violation. Cf. Curtis v. Metcalf, D.C. R.I., 259 F. 961, affirmed Curtis v. Connly, 1 Cir., 264 F. 650, affirmed 257 U.S. 260, 42 S.Ct. 100, 66 L.Ed. 222; Warner v. Penoyer, 2 Cir., 91 F. 587, 44 L.R.A. 761. They have failed to sustain that burden. Indeed, they have not even shown that the excessive borrowings were not substitutionary.

In the light of these conclusions we cannot agree further with the district court that there should be recovery for interest. Considering the borrowings as generally substitutionary, recovery in any event should have been limited to the difference between the amount which was actually paid in interest and the amount which would have been paid had there not been substituted for the "pool loan" new borrowings at higher rates of interest. But in addition, the master found, without contradiction from the district court, that "the desirability of paying off the pool loan, if the bank was to continue as a going concern, is not open to question. All of the bank's assets were pledged for its payment, and the trustee had an uncontrolled discretion with respect to any collection whether to apply all or any part of it to the pool loan. The expense of the trusteeship was substantial. The bank was at a disadvantage with unfettered banks in competing for new business. It could not obtain a surety bond, and was obliged to purchase and deposit Liberty Bonds as security for public deposits." It is clear that in getting out from under the burden of the "pool loan," the bank was released from onerous obligations, and that this release was good consideration for the increase in the interest rate on the bank's borrowings. So again proof fails that the bank suffered damages, and defendant accordingly may not be held for the claimed loss.

7. Loans Made While Reserves Were Deficient. City National Bank was deficient in its reserve balances at the Federal Reserve Bank almost continuously throughout its life. Under 12 U.S.C.A. § 462, these balances must equal a certain percentage of the bank's deposits. By 12 U.S.C.A. § 464, it was provided: "The required bal-

ance carried by a member bank with a Federal reserve bank may, under the regulations and subject to such penalties as may be prescribed by the Federal Reserve Board, be checked against and withdrawn by such member bank for the purpose of meeting existing liabilities: Provided, however, That no bank shall at any time make new loans or shall pay any dividends unless and until the total balance required by law is fully restored." The proviso was eliminated by Act of July 7, 1942, c. 488, § 3, 56 Stat. 648.

▇▇▇ The bank made a number of loans while its reserve balance was deficient. Upon these, a total sum of $28,545.65 proved uncollectible. The bank also paid penalties in the amount of $5,178.21 during the nearly three years of its existence. Whether defendant is liable for these sums depends again upon whether the losses can be considered as caused by the statutory violation. Section 464 is a provision of the Federal Reserve Act; and by 12 U.S.C.A. § 501a, directors participating in or assenting to violations of this Act are held personally liable for all damages which the bank, its shareholders, "or any other person" shall have sustained in consequence of such violation.[7]

Considering the unpaid loans, the important part of § 464 is the proviso forbidding loans until the legal balance is restored. We may not draw too extensive conclusions from its elimination in 1942; presumably the penalties assessed by the Federal Reserve Board, later the Board of Governors, were considered a more appropriate and flexible method of control. But it would seem necessary to give some effect to the provision while it was the law of the land. Following the conclusion suggested

in our discussion above as to the excess borrowings of the bank, both the common law and the statute appear to require only a causal relation between the loss and the violation of the law, and not a showing of negligence in making the loans. The loans were prohibited; they resulted in loss. Moreover, whatever else the purpose of the statute may have been,[8] it seems fully as much for the protection of depositors and creditors as, say, § 84, limiting the amount of loans to any one person, for violation of which loss has been assessed, Corsicana National Bank v. Johnson, supra; Atherton v. Anderson, supra. Reserves behind deposits are a source from which deposits can be paid promptly as required, as, indeed, § 464 specifically provides. A prohibition on new loans operates to the same end by keeping the bank's funds liquid; it says to the officers, "You cannot freeze any more assets until you bring your reserves back." Moreover, it is a brake on excessive lending, since generally today money loaned by the bank goes to swell its deposits. Westerfield, Money Credit and Banking, 1938, 181, 203. Logically complementing § 84, which provides for a diversification of risks, § 464 assures depositors a limit on total risks—for the more extensive are a bank's loans, the greater is the risked total loss to its depositors upon a liquidation.

▇▇▇ Further, the companion prohibition of § 464 against declaration of dividends while reserves are deficient seems of the same character as the like prohibition of § 56—for whose violation losses were assessed in Federal Deposit Ins. Corp. v. Mason, supra—against the making of dividends which impair capital and thereby increase the risk of loss to depositors in liquidation. We cannot find reality in

---

[7] This corresponds to the last sentence of 12 U.S.C.A. § 93, note 5, supra, although there is no modifying provision similar to the first sentence of § 93, using the word "knowingly." The first sentence of § 501a contains merely a provision for forfeiture of its franchise by a national bank which failed to become a member of the Federal Reserve System within one year after December 23, 1913, or failed to comply with the provisions of the Act. In Holman v. Cross, 6 Cir., 75 F.2d 909, the court thought that this statute became ineffective at the expiration of the year; and it pointed to § 503 as providing for directors' liability for the numbered sections there specified (which do not include § 464). But it seems clear, as

the master concluded, that only the provision as to failure to become a member of the Federal Reserve System so expired. The history of § 503, showing that it was only a part of a single section which set out in full all the numbered provisions now specified in it, Act of Dec. 23, 1913, c. 6, § 22, 38 Stat. 272, amended by Act of Sept. 26, 1918, c. 177, § 5, 40 Stat. 970, dissipates the negative inference drawn from it in the Holman case. That case also referred to the omission of § 501a from the code by the compilers, but more lately it has been regularly included by the compilers.

[8] A purpose suggested in Holman v. Cross, 6 Cir., 75 F.2d 909, is considered infra.

ascribing quite different purposes to statutes of similar nature which all have the general objectives of assuring bank liquidity and safety by correct bank practices. In making these loans, therefore, we think the bank violated both the letter and the spirit of the statute; and here there was no salvaging or reduction of other burdens or obligations. We conclude that loans so prohibited by § 464 were made at peril, and liability follows for those which were not repaid.

Defendant relies upon Holman v. Cross, 6 Cir., 75 F.2d 909, and Allen v. Luke, C.C. Mass., 163 F. 1018. While these cases can be distinguished on the facts, as it seems the reserves were there restored before the closing of the banks, the reasoning relied on is contrary to the views here expressed. In the Holman case the court considered the provision for a reserve only for the benefit of the federal reserve banks and to furnish funds for these banks. This seems to us an inadequate conception of § 464. Moreover, neither case discusses the proviso making loans illegal. It can be agreed that loss from the reserve deficiencies as such is not proven; but that is not the real issue. It is the loss from the *illegal loans* which is involved. We are, therefore, constrained to disregard these cases as authorities for our problem here.

In connection with defendant's liability on this claim, it is to be noted that the deficiency in reserve was criticized in every National Bank Examiner's report during the bank's life, that each monthly report of the Comptroller of the Currency referred to penalties paid by the bank for these deficiencies, that these reports were submitted to the directors, and that the criticisms of the bank examiners were discussed at directors' meetings following each examination where the specific deficiency was brought to the attention of the directors. In the face of these continued criticisms, defendant cannot claim immunity from responsibility merely because he absented himself from these meetings.

As to the penalties, the master and the court both disallowed the claim made for them; and the plaintiffs have made no issue as to them on this appeal. Consequently we have no occasion to consider them.

8. The Tarrier Transaction. When, as a part of the 1930 recapitalization of the bank, the Tarrier Company was organized to, and did, purchase the doubtful assets of the bank, it was made plain both to the bank's stockholders and to the public that only bad and questionable assets were to be thus transferred. Nevertheless, two items of substantial value were included. They consisted of twenty-four cashiers' checks of the bank aggregating $48,-295.64 and a "Bankers' Guarantee," upon which Tarrier ultimately realized $62,500. Plaintiffs claim that this transfer was an act of negligence on the part of the directors, and the district court granted recovery for both items.

The "Bankers' Guarantee" had been inherited from City National Bank and Trust Company. As we have seen, that bank, upon taking over the assets of certain failed banks in 1926, obtained a guarantee of their quality from the First National Bank of Miami and the Bank of Bay Biscayne. This was embodied in the so-called Giro Agreement, signed on July 15, 1926, by the three banks involved and by the Miami Giro Corporation, a corporation organized to solicit contributions from public-spirited citizens to protect City National in the steps taken to stabilize the bank situation. The agreement is long and complicated. It provided that of the assets taken over by City National from the two failed banks (Miami Bank & Trust Company and Commercial Bank & Trust Company) those which the parties had designated as "doubtful paper" should be segregated from the "general portfolio"; that the guarantee should apply only to the doubtful paper; that as City National was able to make collections on the doubtful paper, it might withdraw the cash collected and substitute paper from the general portfolio for the paper thus eliminated from the doubtful category; and that the right of substitution should cease on June 15, 1928, at which time the rights of the parties on their respective guarantees should become fixed and the amounts thereof payable. This was to be accomplished by applying first the capital, surplus, and undivided profits of each of the "absorbed banks" as a credit against the amount due on the doubtful paper of each respectively; thereafter Miami Giro was to contribute the sum of $500,000 against any remaining doubtful paper; and finally each of the three banks was to be responsible up to $150,000 for any net deficiency. The guaranteeing banks might withdraw *doubtful*

paper at par value from the portfolio to cover payments, with the right thereafter to Miami Giro to make a like withdrawal to cover its payment; and the remainder of the doubtful paper was to be returned to the "absorbed banks," whose corporate existence was not to be terminated.

After July 15, 1928, City National Bank sought an accounting under the guarantee. Miami Giro had given the notes of third parties to the bank to secure its liability as guarantor; and although some of these proved worthless, the bank had realized nearly $200,000 on others by February, 1929. The guaranteeing banks whose liability was unsecured refused, however, to respond at all and set up several legal defenses, including the contentions that the original agreement was ultra vires and that it had been breached by City National. Negotiations reached the point early in 1929 when the two banks offered City National a total of $75,000 in settlement, which the latter refused. During this period and up to April 4, 1930, City National collected $48,295.64 from the doubtful accounts, for which it issued its cashiers' checks to its own order. Those were held by the cashier without any definite record of them on the bank's books.

On April 4, 1930, when what we have termed above as the second recapitalization of the bank took place, it charged off on its books, as transferred to the Tarrier Corporation, most of its doubtful assets, including the doubtful accounts covered by the guarantee. For these Tarrier paid $1,-000,000 cash. On May 20, 1930, a formal assignment to Tarrier was executed. It might perhaps have been expected that at least the bankers' guarantee should pass with the doubtful accounts, which it secured; but this matter appears to have been in the hands of attorneys for the bank, and thus separately handled. At any rate, the cashiers' checks were not transferred on April 4, along with the doubtful assets; and neither the guarantee nor the cashiers' checks were included in the formal assignment of May 20. The cashiers' checks were, however, transferred to Tarrier by July 7; for these, Tarrier took a certificate of deposit, for which it received full credit as an offset against its debt to the bank when the latter closed. An assignment of the guarantee was made only after the bank had closed. In January, 1931, the president executed and delivered an attempted assignment as of June 30, 1930.

And in January, 1932, Receiver Spurway also executed an assignment, being authorized thereto by the Comptroller of the Currency and by order of the United States District Court for the Southern District of Florida. Since the Bank of Bay Biscayne had failed, no recovery was had from it on the guarantee; but Tarrier eventually settled with the First National for $62,500, for which amount, together with the amount of the checks, the court below allowed recovery.

So far as the guarantee is concerned, it does not seem doubtful that the officers and directors of the bank contemplated the transfer of the guarantee as a phase of the bargain. This is evident from a letter from Gordon, the bank president, to Gwinn dated January 28, 1930, referring to the proposed sale of the questionable assets, "plus the bank's interest in the Giro matter," and from a directors' resolution of February 17, 1930, authorizing the sale of the questionable assets, "as well as all the right, title and interest which the bank now has or may hereafter have in any suspense or indirect assets released from or under the Giro Agreement; i.e., either in the General Portfolio or the Indemnity Fund, or the so-called Bankers' Guarantee." Also, the guarantee was charged off the bank's books on April 4, 1930; and even though it was not listed in the formal assignment of May 20, an accompanying letter from Gordon to Tarrier stated that an assignment of the bank's interest in the "Giro Agreement" was being prepared by its lawyer and would be delivered in the near future.

In this connection plaintiffs point out that the resolution of February 17, 1930, specifically referring to the Giro Agreement, was not brought to the notice of the stockholders or the Comptroller of the Currency incident to their approving the recapitalization here involved; and they stress the numerous occasions when the stockholders, the Comptroller, and the public were informed that "bad and questionable assets" were being transferred. In fact, defendant made a public announcement to this effect in the Miami newspapers on April 1, 1930. Plaintiffs have alleged and attempted to prove a conspiracy to transfer assets of substantial value to Tarrier. But the evidence, as the master definitely found, seems inadequate to prove a conspiracy.

The facts just stated hardly show fraud. The Tarrier transaction as a whole was

distinctly favorable to the bank as a device to supplant questionable assets with cash. That the resolution of February 17, 1930, was more detailed than other votes is not significant by itself. The guarantee had been carried on the bank books at the amount of $277,217.84, of which the bank examiner in 1929 had considered $100,000 as "slow" and the remainder as "doubtful." Viewing it as a separate item, it would seem proper to call it questionable. But in addition, it secured items clearly doubtful; if these were to be transferred, the guarantee should accompany it, for it would operate only as the guarantors withdrew items of doubtful paper to cover their payments upon it. And if there had been a conspiracy of several months' planning and involving many persons, it seems strange that it was not carried through by transfers made at the time.

Finally, all these points were, if not known, at least readily available when transfer of the guarantee by the receiver was eventually approved by the Comptroller of the Currency and the District Court for the Southern District of Florida in 1931 and 1932. The receiver sought approval on representations that its assignment had been omitted by inadvertence; but also, as he pointed out, he was to receive, by way of consideration, payment from Tarrier of its indebtedness to the bank and of a note held under the Miami Giro Corporation guarantee. This appears to have been an adjustment of a disputed matter which we ought not to upset without more showing than was made.[9]

Plaintiffs do rely upon one other circumstance as showing conspiracy. This was testimony of Roberts, the comptroller of the bank and an extensive witness for plaintiffs, to the effect that Saunders, vice-chairman of the Board of the bank and resident manager of Penney-Gwinn, gave instructions on April 4, 1930, to add these two items to those to be transferred to Tarrier; and that when he protested they were valuable, Saunders told him that Penney-Gwinn had been called upon to put up more money than it had anticipated and "simply had to have a little sweetening along with it." How definitely sinister this was is hard to appraise; it would seem at most to constitute an interpretation—whether legally correct or not—of a transaction then already authorized, rather than a showing of planned conspiracy by many, going back several months in point of time.

As to the cashiers' checks, there is perhaps more question. Possibly those were intended to be designated by the words "suspense or indirect assets released from or under the Giro Agreement" in the resolution of February 17, 1930, though the description is not completely apt. On the other hand, the whole purpose of the Giro Agreement was to protect City National against failure to collect doubtful assets; and when it actually made such collections, it would seem that it should take the amounts collected and thus reduce the guarantees. The difficulty is that the Agreement expressly permitted substitution only until June 15, 1928, at which time the guarantees were to become definitely fixed in amount and then paid. Did the failure of the bank guarantors to fulfill their promise change this result? It would seem that City National could have treated the Agreement as dishonored by the two defaulting banks. But Miami Giro had lived up to its promise—albeit reluctantly and of necessity—and it, as well as the "absorbed banks," was entitled to performance by all parties to the Agreement. And in any event it does not seem conclusively negligent for the bank to have treated the contract as still existing in the hope of a favorable turn to its negotiations for settlement. If the Agreement was still in existence, these checks would be necessary to its operation, for the banks were bound to make good—up to the agreed maximum—on doubtful paper remaining uncollected on June 15, 1928, and had their choice on payment of taking over paper to cover their payments. So long as the Agreement was still in effect, the bank did not

9 The court's approval of this settlement under 12 U.S.C.A. § 192 is to be treated as a step in the administrative approval of the bank's liquidation, rather than as a court judgment between the parties. Mitchell v. Joseph, 7 Cir., 117 F.2d 253; Whelan v. Blankenbeckler, 5 Cir., 87 F.2d 81; Hulse v. Argetsinger, 2 Cir., 18 F.2d 944. Even if it could be attacked collaterally by the successor to the receiver who originally sought it, without his first seeking to set it aside, Schmahl v. Aurora Nat. Bank, 311 Ill. App. 228, 35 N.E.2d 689, 692, it would seem clear that it must be accorded administrative finality unless fraud or other grounds of impropriety appeared. Roth v. Hood, 6 Cir., 106 F.2d 616.

have title to these collections, but they must be considered as merely an adjunct of the guaranty agreement itself. Under the circumstances, we think the legal situation too doubtful to hold the directors negligent for failure to seize upon this fund for the bank. Both Tarrier claims must, therefore, be rejected.

▊ 9. Improper Loans by the Bank's Committees. The court has held defendant for four loans which appear to have been negligently made either by the bank's Loan and Discount Committee or by its successor, the Executive Committee. These were a loan of $20,000 in 1928 to L. D. Llewellyn, Inc., upon which a net loss of $8,609.14 was sustained, a loan also in 1928 of $4,000 to J. E. Rose & Company, upon which the loss was $2,294.91, a loan in 1929 and 1930 of $6,000 to Central Miami Corporation, with a loss of $4,402.38, and an exchange of mortgages in 1929 with the Norton Apartments, which resulted in a loss of $10,693.12. As to some of these, there was claim that they were proper salvaging operations; but we do not think their propriety as such or the reasonable chance of the success of an otherwise improper transaction was shown. The master thought, however, that the directors were excused because the delegation of authority to the committees being proper, the directors were liable only for negligent failure to supervise the committees' activities, and this was not shown. Warner v. Penoyer, supra. But we think that this cannot be sustained. The last two loans at least were made after repeated warnings of the bank examiner as to the improper practices of the Loan and Discount Committee. The Central Miami transaction in particular was a Coral Gables operation in miniature. And even as to the advances made in 1928, the bank examiner's reports had criticized outstanding and overdue loans to Llewellyn and to Rose. Moreover, these committees were dominated by Saunders, who appears to have consulted more with Gwinn than with the other officers of the bank. Saunders was actually defendant's personal representative on the Board. An engineer by training, he came to Florida only in 1926 to handle real estate developments for Penney-Gwinn and the affairs— including payment of employees—of defendant's Florida residence. He was placed on the Board and made its vice-president and a committee member at Gwinn's direction. Under these circumstances, de-

fendant cannot be heard to deny responsibility for, or lack of knowledge of, Saunders' actions during his prolonged absences from the bank. We agree with the district court, therefore, in holding defendant for all these losses.

10. Preferential Payments to Penney and Penney-Gwinn. The largest single item of recovery allowed by the district court was for "preferential payments" of $566,-101.26, being repayments of the sums of $880,000 "deposited" by defendant and by Penney-Gwinn to tide the bank over its crisis of June, 1930, less the sum of $313,-898.74, representing the increase of the Penney-Gwinn account at the time of the bank's closing over what it was at the time of the last withdrawal. Plaintiffs attack this reduction as made by the court, and ask for the full amount of the repayments. Defendant claims, however, that the elements of a preferential payment as defined by 12 U.S.C.A. § 91 were not present, because the repayments were not made by the bank "after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another."

It was amply proved that these funds were loaned the bank for this particular emergency and were to be returned, as soon as the crisis had passed, with interest, to cover like charges incurred by defendant and Penney-Gwinn in borrowing the money from New York banks. On June 11, 1930, the day of the run precipitated by the failure of the Bank of Bay Biscayne, the bank received as special deposits $100,000 from defendant and $250,000 from Penney-Gwinn; on June 12, Penney-Gwinn supplied an additional $150,000. By June 23, however, the crisis had passed, and Penney-Gwinn began a move to recover its loans by withdrawing $100,000; but, being appealed to by the bank officers for help in presenting a good appearance for the bank statement due July 1, 1930, it deposited $380,000 on June 28. On July 7, 1930, however, defendant withdrew $100,000, and Penney-Gwinn withdrew $680,000, thus finally closing out these special deposits. Both defendant's small personal account and the Penney-Gwinn regular account remained as before the run of June 11. Thereafter the Penney-Gwinn account, which had stood at $171,602.13 at the time of the loans, rose as high as $576,591.91 on

November 1, 1930, and amounted to $485,-500.87 when the bank closed. The bank's cash position on July 7 after the withdrawals stood at $1,039,820.39, as compared to $842,902.55 on May 23, 1930.

We agree with the master that the proof does not support a conclusion that the repayments were made after commission of an act of insolvency or in contemplation thereof, and with an intent to prefer. The cases regularly define insolvency as a present inability to meet currently maturing obligations, rather than as a mere excess of liabilities over assets. McDonald v. Chemical Nat. Bank, 174 U.S. 610, 19 S.Ct. 787, 43 L.Ed. 1106; Nelson v. Lewis, 2 Cir., 73 F.2d 521; Aycock v. Bradbury, 10 Cir., 77 F.2d 14, certiorari denied 296 U.S. 589, 56 S.Ct. 101, 80 L.Ed. 416; Willing v. Eveloff, 3 Cir., 94 F.2d 344, certiorari denied 305 U.S. 611, 59 S.Ct. 70, 83 L.Ed. 389; Prentiss v. Chandler, 9 Cir., 85 F.2d 733, certiorari denied 300 U.S. 654, 57 S.Ct. 431, 81 L.Ed. 864; Kullman & Co. v. Woolley, 5 Cir., 83 F.2d 129; Uhl v. First Nat. Bank & Trust Co., D.C.W.D.Mich., 24 F. Supp. 275, affirmed 6 Cir., 94 F.2d 1013, certiorari denied 304 U.S. 584, 58 S.Ct. 1058, 82 L.Ed. 1546. No act of insolvency within this definition occurred prior to December 20, 1930.

The district court attempted to meet this objection with certain findings of difficulties the bank had experienced from time to time in making its required payments. Thus, as early as July 5, 1929—before the recapitalization of April 4, 1930, which appears to have put the bank in good running order for the time being—Gwinn had asked repayment of a Penney-Gwinn loan soon to become due. Davis, then president, wired that it was "not possible" to remit "today," and wrote that to do so would leave their cash too low and would cause comment among the bank employees. Again at the height of the run on June 11, 1930, the tellers ran out of cash, and depositors in line were told that currency was being brought by plane from the Federal Reserve branch in Jacksonville. The money did not arrive until about 4:00 P. M., two hours after the usual closing hour. Depositors who remained were paid, and no trouble was experienced the next day. Finally, when on June 18 and 19, 1930, the treasurer of Penney-Gwinn asked for repayment of the special deposits, Saunders wired that the bank was prepared to meet

their draft for $100,000 (as it did), "but lay off of us for any further funds until after next comptroller call about July first." These, of course, all show a necessity of cutting the cloth most carefully to meet the necessary pattern; but that was the entire history of the bank. So far as intent goes, these incidents show a rather grim determination to keep going. And except for the brief time when there was a shortage of cash on June 11, there was no present inability to pay obligations. Certainly the appeals made to Penney-Gwinn for more time were in themselves no final refusal to pay and were, indeed, not unreasonable or unnatural in view of the relationship of the parties. And a temporary cash shortage caused by an unusual demand which led to no substantial delay or harm to the depositors cannot be reasonably considered an absolute inability to meet depositors' demands.

The district court seriously stresses a further circumstance, however, not so much as proof of an act of insolvency as a showing that during all this period the bank officers must reasonably have known that failure was imminent. Gordon, who became president of the bank early in 1930, was disturbed to find conditions as unsatisfactory as they were. So, as a report for Gwinn, and in part to protect himself against future criticism, he caused an appraisal to be made of the assets by other officers of the bank, which showed a small credit balance. But with this he also sent Gwinn a confidential appraisal, which, on the values therein stated, indicated that as of May 23, 1930, there was a deficiency of assets as against liabilities to the extent of $1,345,766.41. In an accompanying letter, dated May 26, Gordon explained: "This appraisal is for our own eyes and does not reflect the attitude that we would take in appraising this paper with the Examiner, because in the first place the losses which we have appraised in this statement are by no means certain and we have purposely put the situation in the worst light that is possible, since I feel that you and Mr. Penney want just this type of appraisal."

Even if the appraisal had been accepted by the parties as accurate, this would not necessarily evince an intention or expectation on the part of the officers of the bank presently to suspend business. Nor should they reasonably have had such an intention or expectation. "It is matter of common

434

knowledge that banks and other corporations continue, in many instances, to do their regular and ordinary business for long periods, though in a condition of actual insolvency, as disclosed by subsequent events. It cannot surely be said that all payments made in the due course of business in such cases are to be deemed to be made in contemplation of insolvency, or with a view to prefer one creditor to another. There is often the hope that, if only the credit of the bank can be kept up by continuing its ordinary business, and by avoiding any act of insolvency, affairs may take a favorable turn, and thus suspension of payments and of business be avoided." McDonald v. Chemical Nat. Bank, supra, 174 U.S. at page 618, 19 S.Ct. at page 790, 43 L.Ed. 1106. See, also, Prentiss v. Chandler, supra. As a matter of fact, the appraisal indicated little that was new about the bank's over-all condition to these persons who had been steadily called upon to support it from the beginning. In the light of its history and of the other factors present, we agree with the master that this circumstance does not prove contemplation of an act of insolvency upon the part of the participants.

But it may be argued from the size of the deposits withdrawn here and from the circumstances of the antecedent agreement for their repayment after confidence in the bank was restored that the repayments were not made in the usual course of business. It would seem quite usual, however, for a bank—even a prosperous one—to borrow funds temporarily to meet a run, and it would seem immaterial that the loan should take the form of a special deposit. Furthermore, once the repayments are related back to the antecedent agreement, we think the equities are against a decision in plaintiffs' favor. Cf. Lane v. School Dist. of City of Monessen, 3 Cir., 120 F.2d 479. The obvious design of the agreement was not only to insure a fair distribution of assets among the depositors by voiding the effects of the run, but also to prevent an immediate forced liquidation of the bank, with its attendant losses to depositors, in the hope that the bank could be subsequently rehabilitated. Cf. Mechanics Universal Joint Co. v. Culhane, 299 U.S. 51, 57 S.Ct. 81, 81 L.Ed. 33. That this hope was at the time justified appears from the following finding by the district court:

"Contemporaneously with and following the closing of the Bank of Bay Biscayne, the officers of City National Bank in Miami, including Gordon its President, conducted a campaign to solicit deposits from the depositors of the Bank of Bay Biscayne, and requested the cooperation of the defendant Penney and of Penney-Gwinn in obtaining new accounts for City National Bank in Miami. This campaign for deposits included a radio address of Gordon to the people of Miami, giving assurances as to the strength of the remaining banks including City National Bank in Miami and appealing to the public for its continued support. Arrangements were made to send an armored car to the Town of Homestead, Florida, to the south of Miami, a community then without banking facilities, for the purpose of receiving deposits. This campaign for deposits was successful. In reliance upon the repeated assurances of the defendant Penney that City National Bank in Miami was in a sound financial condition, the people of this community deposited money in the bank."

Plaintiffs lay great emphasis on a telegram sent by defendant to Gordon, president of the bank, at the height of the run, stating that he was squarely back of the City National Bank, and suggesting that Gordon impress on the depositors that "ample funds are available to meet any demands that may be made upon us." This telegram was made public. Gordon also testified that he kept the bank open after May, 1930, only upon the assurances of defendant and Penney-Gwinn that they would provide necessary funds. The bona fide nature of these assurances had been amply demonstrated in the past and was also shown in the crisis of June 11. Gordon and the officers other than defendant thus acted reasonably in keeping the bank open in reliance upon them. As to defendant himself, the evidence fails to justify any conclusion that he underwent a change of heart on June 11 and thereafter secretly connived to recover his deposits before the bank should collapse for want of his support. That defendant in fact had confidence in the ability of the bank to pull through is convincingly shown by the substantial increase in the Penney-Gwinn deposit from this time to the time of the bank's closing, an increase which the court felt showed sufficient equities in defendant's favor to be credited for his benefit.

There is not even any convincing evidence as to the cause of defendant's failure to aid the bank on December 20. We do know that activities in the world of finance generally had seriously slumped. Whether defendant in fact then determined to repudiate all the assurances he had previously made to the bank officers and to the public, and whether he became liable for fraud and deceit are matters outside the scope of this suit; in fact, they are the subject matter of the action which was severed from this one, Michelsen v. Penney, D. C. S. D. N. Y., 10 F.Supp. 537, and which is still pending untried.

In practical fact the entire transaction here was one wherein money was advanced to tide the bank over a particular crisis, the advance served its intended purpose and was returned as per agreement, and thereafter the bank continued with somewhat renewed vigor and at least new depositors. Its closing came only after new misfortunes and a new run, six months later. We believe it would be rather unfortunate for the future of national banks if attempts to save them, made with both as good intentions and as good prospects of success as this had, were to be visited with punishment so heavy as plaintiffs claim. We agree, therefore, with the master in disallowing this entire claim.

 11. Allowance of Interest. The district court allowed interest upon the losses for which defendant was held liable from the dates upon which the respective losses were sustained. Defendant contends that the court erroneously considered the allowance a matter of right when it should have exercised a sound discretion to deny it. Whether the learned judge in fact intended to deny all discretion to a court in cases such as the present one is by no means clear. But we can take it as his conclusion—supported by the citation of Corsicana Nat. Bank v. Johnson and Bowerman v. Hamner, supra—that no legal grounds were shown for the denial of interest here; and with that result we agree. Where the amount for which recovery is sought, even though not liquidated, is based upon the readily ascertainable value of services or property, the general and better considered rule is to allow interest, at least in the absence of strong equities to the contrary. See Faber v. New York, 222 N.Y. 255, 118 N.E. 609; McCormick on Damages, 1935, 224; 25 C.J.S., Damages, § 53, p. 542.

Here the bank suffered losses from definite improprieties; it was entitled to immediate reimbursement, which was not made. That defendant had expended other funds for the bank's benefit does not change the character of these losses. Nor do we feel we should apply the modification suggested in Bates v. Dresser, 251 U.S. 524, 40 S.Ct. 247, 64 L.Ed. 388, modifying 1 Cir., 250 F. 525, 552, that the circuit court of appeals upon substantially modifying the decree of the district court may refuse interest for the period between the date of that decree and the date of its own order. Here we are affirming the district court as to all the allowances we have granted.

12. Summary. We affirm the recovery allowed to the receiver by the district court for the loss itself, with interest thereon, in the following transactions: City National Building, Inc., Coral Gables, Inc., Fred H. Rand, Jr., loans made during reserve deficiency, L. D. Llewellyn, Inc., J. E. Rose & Company, Central Miami Corporation, and Norton Apartments. We disallow recovery of the amount of the loss, in principal and interest, upon excess borrowings, the Tarrier claims, and the alleged preferential payments. Upon matters not specifically discussed, including the allowance heretofore made of costs and disbursements to the plaintiffs and the receiver, we affirm the decision below. Thus, we allow recovery of $596,617.95, plus interest and costs, as against a recovery of $1,414,761.30, plus interest and costs, allowed by the district court. We think, however, it will be desirable for the district court to enter a new judgment, with interest to its date, which will embody the conclusions here reached; and accordingly we reverse and remand the action for this purpose. The costs in this court will be taxed one-half to the defendant and one-half to the plaintiffs and the receiver.

Reversed in part and remanded.

AUGUSTUS N. HAND, Circuit Judge (dissenting in part).

The opinion of the majority imposes a liability of $28,545.65 for losses on loans made while City National Bank was deficient in its reserve balance in the Federal Reserve Bank. See 12 U.S.C. § 464, 38 Stat. 270, 271. The proviso of Section 464 prohibited the making of new loans while the reserve was impaired. The objects of requiring the maintenance of the reserve were to furnish funds to enable the

Federal Reserve Banks to conduct their business and likewise to ensure the maintenance of available cash capital for the benefit of the member banks. It also may be, as is suggested in the majority opinion, a "brake" on over-expansion of credit furnished by the banks in times of business inflation. Whichever of the above reasons for the proviso be adopted, or whether all of them be deemed applicable, I can see no justification for imposing liability for the loss of $28,545.65 and interest since no causal relation is shown between the loss incurred upon the loans here in question and the purpose of the statute. It is true that "but for" the violation of the statute the loans would not have been made and hence the losses would not have been incurred, but it is equally true that the losses would have been incurred had the loans been made at times when there was no deficiency in the reserve account. Therefore the ordinary rule should be applied, that where no negligence in making the loans is established, and no relation has been shown between the loss and the failure to meet the statutory requirement, there is no liability. 2 Restatement Torts (1934) §§ 286, 431 (a); Klinkenstein v. Third Avenue Ry., 246 N.Y. 327, 158 N.E. 886, 54 A.L.R. 369; Corbett v. Scott, 243 N.Y. 66, 152 N.E. 467, 46 A.L.R. 1064. This general rule has been applied in a multitude of instances of statutory violations. The operator of an automobile who has no license, though acting in violation of a statute designed to protect travelers on the highway, is usually held to be neither precluded from recovery for injuries he may sustain nor liable in damages for running over a pedestrian or colliding with another automobile, unless he be negligent in some respect causally related to the harm. Dervin v. Frenier, 91 Vt. 398, 100 A. 760; Atlantic Coast Line R. Co. v. Weir, 63 Fla. 69, 58 So. 641, 41 L.R.A.,N.S., 307, Ann.Cas. 1914A, 126; Clark v. Doolittle, 205 App. Div. 697, 199 N.Y.S. 814; Hyde v. McCreery, 145 App.Div. 729, 130 N.Y.S. 269. The present tendency of the courts is to hold the rule requiring a causal connection equally applicable in the case of trustees' breaches of trust, with the qualification that a trustee who places himself in a position to profit personally by his breach is liable for a "but for" consequence which would have been just as likely to occur had there been no breach. 2 Scott, Trusts § 205.1; Darlington's Estate, 245 Pa. 212, 91 A. 486;

People's State Bank v. Wade, 269 Ky. 89, 106 S.W.2d 74; Note, 50 Harv.L.Rev. 317.

A situation which might bring this principle into clearer light would be one where a bank made a loan while reserves were deficient and one of its employees obtained the note by stealth, sold it and embezzled the proceeds. Had the loan not been made, there would have been no loss, but it seems inconceivable that an absolute liability would be imposed on the directors on the theory that the reserves were deficient. Cf. Darlington's Estate, 245 Pa. 212, 91 A. 486.

It is to be added that the decisions by Judge Francis C. Lowell in Allen v. Luke, C.C.Mass., 163 F. 1018, and by the Sixth Circuit Court of Appeals in Holman v. Cross, March 7, 1935, 75 F.2d 909, were followed by substantial reenactment of the statute, or important amendments to it, without any attempt to change the rule laid down in those cases. Compare R.S. § 5191, 12 U.S.C.A. §§ 141–143, with 38 Stat. 271 (1913), 12 U.S.C.A. § 464. See 49 Stat. 706, (August 23, 1935), amending Federal Reserve Act, Section 19, 12 U.S.C.A. § 462b. This is an indication that the judicial interpretation of its effect met the approval of Congress. Indeed, Allen v. Luke, supra, was decided before the passage of the Federal Reserve Act, which was the occasion of a very full review of the banking laws, upon which Congress must have carefully considered the existing judicial interpretation of the provisions of the earlier acts which it carried into the Federal Reserve Act.

The directors of this bank are not claimed to have profited personally from this breach of statute, nor is it contended that the decision not to suspend the loaning function of the bank was inimical to its best interests. An inability to make loans could only have so far impaired public confidence in the institution as to have forced its early liquidation, and if the responsible public authorities had thought liquidation a desirable course, they could have forced it under Sections 93 and 191, 12 U.S.C.A. A rule which gives a bank's directors the choice of guaranteeing all the loans it may make, or adopting a course apparently regarded as undesirable for the bank, is a rule not to be sanctioned in the absence of a clear statutory mandate, particularly when the statute as it has hitherto been judicially construed gave the directors no warning

of the choice they were making. It is reasonable to suppose that bank directors have relied upon this construction as protecting them from personal liability in making loans that were in themselves safe. They ought not to be held because of a depreciation in the reserves, unless a lack of available cash can be shown to have been the occasion of losses.

Liability for violation of the statute limiting individual loans to ten per cent of the bank's capital and surplus has been imposed in cases of resulting loss. 12 U.S. C.A. § 84; Corsicana National Bank v. Johnson, 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141. The imposition of liability in such cases is entirely consistent with the general principle requiring a causal relation between the violation and the loss. Had the excessive loan been limited to the statutory amount, the loss would certainly not have been so great; nor should it be assumed that the borrower would have accepted the smaller loan at all. See Corsicana National Bank v. Johnson, supra, 251 U.S. at 87, 40 S.Ct. 82, 64 L.Ed. 141. But cf. 1 Restatement, Trusts (1935) § 229, comment b. Section 84 attempts to establish a rule of prudent management and to protect the bank against placing too large a portion of its funds at the risk of a single borrower. In other words, it lays down a rule of due care in making loans, not in maintaining reserves, and the disregard of it is the foundation of what is really liability for negligence, if loss results.

Title 12 U.S.C.A. § 93, prescribes a penalty for violation of the clause against making loans while reserves are deficient, which is and has for many years been a liability to forfeiture of the bank's franchise. It adds a personal liability of the directors "for all damages * * * sustained in consequence of such violation." These are the only sanctions provided by law and they should not be extended by implication so as to impose a personal liability in cases where the loss is not attributed to negligence. A long-settled judicial construction to the contrary as well as familiar rules of statutory liability in my opinion support this view and a contrary result, I think, tends to disappoint well-founded expectations.

I concur in the opinion of Judge Clark except as to Claim 6 in respect of which I think no liability should be imposed.

FRANK, Circuit Judge (dissenting in part).

Judge HAND, in his dissenting opinion, disagrees with Judge CLARK'S opinion on one point; as to that point, I agree with Judge CLARK.

Judge HAND joins in Judge CLARK'S opinion which is thus the majority opinion on another point as to which I disagree—the rejection of plaintiffs' contention that the defendant is liable for non-negligent acts of those persons who were elected as directors but none of whom ever owned "in his own right" $1,000 of the bank's stock and each of whom, therefore, in purporting to act as a director, violated 12 U.S.C.A. § 72 which provides: "Every director must during his whole term of service, be a citizen of the United States, and at least three-fourths of the directors must have resided in the State, Territory, or District in which the association is located, or within fifty miles of the location of the office of the association, for at least one year immediately preceding their election, and must be residents of such State or within a fifty-mile territory of the location of the association during their continuance in office. Every director must own in his own right shares of the capital stock of the association of which he is a director the aggregate par value of which shall not be less than $1,000, unless the capital of the bank shall not exceed $25,000 in which case he must own in his own right shares of such capital stock the aggregate par value of which shall not be less than $500. Any director who ceases to be the owner of the required number of shares of the stock, or who becomes in any other manner disqualified, shall thereby vacate his place."

It seems to be conceded by defendant and by my colleagues, that, since defendant is responsible for the fact that those persons who, although elected as directors, violated these provisions, defendant should be held liable to the same extent as those persons would have been, if they had been sued. Accordingly, I shall consider the case as if they had been sued, and discuss what, in that event, would have been their liability.

1. I think that each of those persons, if sued, should have been liable for net losses resulting from any acts authorized at any meeting which he attended, regardless of whether such authorizations were or were not negligent, i. e., did or did not involve the exercise of reasonable judgment. His liability, I think, is different from that of a director who complied with

§ 72 and who thereby became a lawfully qualified director; the liability of such a qualified director is, I think, correctly set forth in the foregoing opinion of the majority of this court.

The defendant argues, and my colleagues agree, that those persons who were elected as directors but who did not comply with § 72 were de facto directors, and that a de facto director's liability is precisely the same as that of a de jure director. That those persons were de facto directors there can be little doubt; and that a de facto director is liable *at least* to the same extent as a de jure director would seem to go without saying.

2. The sole question is whether his liability is greater. Since that question is not discussed in the cases, it seems appropriate to turn to decisions relating to de facto public officers.[1] There the well-settled rule is that the de facto doctrine is exclusively for the benefit of persons who have in good faith relied upon the acts of the de facto officer, and not at all for the benefit of the de facto officer himself.[2] An alien who is elected to the office of sheriff, when the statute provides that only a citizen may be a sheriff, if nevertheless he purports to exercise the powers of that office, is but a de facto, not a de jure, sheriff. If, acting under a valid writ, he levies on and sells property, the defect in his title to his office is not permitted adversely to affect the execution creditor or the purchaser at the execution sale; an attack on the officer's title to his office is, in such cases, a "collateral" attack and is precluded by the de facto doctrine. But where the de facto officer is himself sued by the debtor—so that the attack is "direct"—then the de facto doctrine becomes inoperative; thus, if a sheriff, acting under a valid writ, enters on land or arrests a person, and is then sued for trespass or assault, he can justify by showing that he is a de jure officer and that his conduct was authorized by statute conferring power, upon one holding the office of sheriff, to commit such acts; but if he is merely a de facto sheriff, then such justification fails and he is, in contemplation of law, not a sheriff at all but merely a wrong-doer who has no defense.[3] "If this were not so, then there is no difference between a legal and an illegal appointment to office, and an officer de facto is the same as an officer de jure, which is absurd."[4]

3. If a de facto sheriff, although armed with a valid writ, enters a man's house, he is, so far as that man is concerned, a mere trespasser. A trespasser acts at his peril, is absolutely liable for any loss resulting from his acts done while trespassing. For example, one who, as trespasser, enters a house and lights a fire in a fireplace, using all due care in lighting and maintaining the fire, is nevertheless liable if, because of totally unexpected circumstances which no care would have guarded against, the fire bursts out into the room and the house is destroyed.[5]

[1] In Matter of Ringler & Co., 204 N.Y. 30, 42, 46, 97 N.E. 593, Ann.Cas.1913C, 1036, the doctrine relating to de facto public officers is applied to de facto corporate directors.

[2] Nichols v. MacLean, 101 N.Y. 526, 538, 539, 5 N.E. 347, 54 Am.Rep. 730; Carpenter v. Clark, 217 Mich. 63, 185 N.W. 868, 870, 871; Pack v. United States, 41 Ct.Cl. 414, 430; Patterson v. Miller, 2 Metc. 493, 59 Ky. 493, 496, 498; Hughs v. James, 3 J.J.Marsh 699, 26 Ky. 699, 670; Pearce v. Hawkins, 2 Swan 87, 32 Tenn. 87, 89, 90, 57 Am.Dec. 54; Hussey v. Smith, 99 U.S. 20, 24, 25 L.Ed. 314; Norton v. Shelby County, 118 U.S. 425, 441, 6 S.Ct. 1121, 30 L.Ed. 178; 57 C.J. 794–795; 46 C.J. 1047, 1061; Throop, Public Officers, 614–615, 623.

[3] Cummings v. Clark, 15 Vt. 653, 658; Patterson v. Miller, supra; Pearce v. Hawkins, supra; Blake v. Sturtevant, 12 N.H. 567, 573; Brewster v. Hyde, 7 N.H. 206; Miller v. Callaway, 32 Ark. 666;

Pooler v. Reed, 73 Me. 129; Stubbs v. Lee, 64 Me. 195, 18 Am.Rep. 251; People v. Weber, 89 Ill. 347; Throop, loc. cit.; C.J. loc. cit.; Cf. Gourley v. Hankins, 2 Iowa 75, 76a; Matter of Ringler, supra; Green v. Burke, 23 Wend. 490, 503; Hughs v. James, supra; Short v. Symmes, 150 Mass. 298, 23 N.E. 42, 15 Am.St.Rep. 204.

[4] Pearce v. Hawkins, supra; Cf. Riddell v. Bedford County, 7 Serg. & R. 386, 392: "The sound distinction * * * is, that the office is void" as to the officer himself, "but not as to strangers."

[5] Wynant v. Crouse, 127 Mich. 158, 162, 163, 86 N.W. 527, 53 L.R.A. 626; Southern Counties Ice Co. v. RKO Radio Pictures, D.C., 39 F.Supp. 157, 159, 160; Eten v. Luyster, 60 N.Y. 252, 253, 260; Newsom v. Meyer, 93 Conn. 93, 128 A. 699, 700; Keesecker v. G. M. McKelvey Co., 64 Ohio App. 29, 27 N.E. 787, 789, 790; Badu v. Satterwhite, Tex.Civ.App., 125 S.W. 929; Lee v. Stewart, 218 N.C.

4. And so, I think, as to a de facto bank director, i.e., one who, although elected as a director, fails to fulfill statutory provisions prescribing qualifications for that office. His acts are regarded as valid as to persons who, in good faith, have relied on those acts. But where a de facto director is sued for his conduct, by or on behalf of bank depositors, the attack is "direct" and the de facto director cannot justify by asserting that he acted lawfully as a director. As his conduct is unauthorized, he is, I think, in such a suit to be regarded not as a director but as a mere stranger, a trespasser meddling in an unlawful way with the money of others.

Accordingly, if de facto bank directors are shown to constitute a majority at a directors' meeting at which action is taken which subsequently leads to the bank's net loss, they are, I think, liable even if, had they been de jure directors, they would have been without liability because exercising appropriate care. For the de facto directors, being regarded in such a suit as mere trespassers, are to be considered as wrongfully directing the use of other people's property. No matter how careful they may have been in the exercise of their judgment, they are absolutely liable, I think, as in effect trespassers, for net losses flowing from their non-negligent acts. If that were not so, there would be no difference between a de jure and a de facto director.

5. In the case at bar it is not clear in what particular instances the de facto directors constituted a majority at meetings at which acts were authorized which subsequently led to net losses. Of course, no de facto director could be held liable for an act authorized or ratified at a meeting which he did not attend. As to meetings, if any, attended by some of the de facto directors, where they were not in the majority, it might perhaps be argued that their presence at those meetings had no relation to such losses, and that the situation was the same as if strangers, known to the directors not to be directors, had been invited to sit and confer with the directors at a meeting; obviously such strangers would not be liable for any acts authorized by the directors; and so it might be said that the de facto directors here, where they were in the minority, cannot be held liable for acts authorized.

That argument, however, seems to me to overlook this important fact: The de facto directors did not purport to appear at the meetings as mere strangers. They came purporting to be directors. It was just as if strangers, not even elected to the board, disguised by a make-up man so that they were mistaken for some of the de jure directors, participated in a directors' meeting. Here the de jure directors, even in instances, if any, when they constituted the majority, presumably gave heed to the views of the pseudo-directors. What the persuasive powers of those pseudo-directors may have been we do not know. Their views may have induced the actions taken at such meetings. Certainly our own experience as members of this court goes to show that not infrequently a decision results from views expressed by one of three judges at our conference on a case, that his views may persuade the other two judges to arrive at a conclusion which, in his absence, they would not have reached.

I believe, therefore, that if the de facto directors had been sued, the burden of proof should have been on them to show that, notwithstanding they did not at any meeting constitute a majority, their views, expressed at the meetings which they attended, did not prevail and did not induce the authorization of acts subsequently resulting in loss to the bank.[6] If that is correct, then defendant had that burden. He did not discharge it. Accordingly, I believe that he should be held liable for all acts, authorized at all meetings attended by any of those persons, at which meetings acts were authorized which later resulted in net loss to the bank.

6. I do not understand the contention that such a conclusion will mean the imposition of liability in the absence of a causal relation between the defendant's conduct and the losses for which he is held. The defendant was an active participant in the failure of the de facto directors to become

---

287, 10 S.E.2d 804, 805; Cribbs v. Stiver, 181 Mich. 82, 147 N.W. 587; Restatement of Torts, § 380.

6 Unless such a burden of proof rule is applied, probably no consequence will ever attach to a violation of § 72 unless a majority of those purporting to be directors who attend directors' meetings are guilty of such violation, i. e., violation of § 72 by a single director will probably never have any legal consequences.

de jure directors and is liable only to the extent to which they would have been, had they been sued. They, in turn, if my thesis were accepted, would be liable only for losses resulting from acts which they authorized or the authorization of which they brought about. To say that there is, under such a rule, an absence of causation is to say that, wherever the doctrine of absolute liability is applied, there is no causation. That is not true. In Rylands v. Fletcher, L.R. 3 H.L. 330, the defendant was liable only because damage resulted from his act of building the reservoir; the trespasser whose non-negligent fire-building leads to destruction of the house is liable only because there is a factual causal chain between his fire-building and that destruction.

Usually one whose conduct results in loss to another is exculpated if he used due care; he is, on grounds of policy, accorded a defense of that sort, despite the fact that the loss is in fact traceable to his conduct. The doctrine of absolute liability does not dispense with the necessity of showing a factual causal chain; it merely strips the defendant of . a defense which he would ordinarily have, because, on grounds of policy, it is considered that he ought not to be allowed such a defense. And so here, to impose absolute liability on the de facto directors for losses resulting from acts the authorization of which they induced is not at all to hold them for damage causally unrelated to their conduct. It is scarcely necessary to add that to put the burden of proof on them to show that they did not induce such authorization is no deviation from the rule that factual causation must exist.[7]

7. My colleagues note that the trial judge, having adopted what I consider the correct rule as to the nature of the liability of the pseudo directors, did not carry that rule out to its logical conclusion. But, of his failure to go further than he did, the plaintiffs are complaining here on their cross-appeal. My colleagues also suggest that perhaps the plaintiffs have not even on this appeal asked for the full recovery to which they would be entitled under that rule; they indicate that, to be logical, the receiver, on his appeal, should have asked for damages to the stockholders resulting from the acts authorized by the de facto directors. But what of it? If a party, logically or illogically, waives a portion of the damages to which he would have been entitled, that is his privilege; such a waiver of part of that which he could otherwise have recovered can, of course, not deprive him of the right to the unwaived balance.

It is further suggested that, under the rule I consider correct, possibly some "negligent losses" will go unchallenged. That suggestion I do not comprehend, since the pseudo directors would have been liable for net losses resulting from their acts whether negligent or not, and the de jure directors would have been liable for all losses authorized by them where they acted negligently; as the defendant. will be liable wherever the de jure or de facto directors would have been liable, he cannot conceivably escape liability for "negligent losses."

8. Judge CLARK and Judge HAND agree that there was a clear violation of § 72 and that the defendant was responsible for that violation, but reject my views for the following reasons (in addition to those which I have already discussed): (a) There was no proof that the pseudo directors were "irresponsible or untrustworthy men" and "proceeded forthwith to loot the bank's exchequer"; (b) it would be unwise, as a matter of policy, so to construe the statute as to hold that directors who violate § 72 act at their peril, since such a rule would make "prudent and responsible men loath to accept directorates, to the community's loss in lack of men of caliber for these positions of trust," citing Yates v. Jones National Bank, 206 U.S. 158, 179, 27 S.Ct. 638, 51 L.Ed. 1002; (c) Briggs v. Spalding, 141 U.S. 132, 152, 11 S.Ct. 924, 35 L.Ed. 662, supports the position that failure to comply with § 72 does not have the consequences I would attach to it. I

---

[7] My colleagues have, I believe, misunderstood what I have said as to the burden of proof; for they indicate that, wherever in the majority opinion there is a ruling that recovery is to be allowed, that ruling takes into account all the evidence as to the impropriety of the directors' acts. But none of those rulings takes into account the burden of proof on the defendant to show that, in those instances where a pseudo director attended a meeting, the pseudo director did not bring about the authorization of an act which resulted in a net loss to the bank for which that de facto director, as a trespasser, should, I think, have been liable if sued, and for which the defendant therefore should be liable.

cannot agree with any of those suggestions.

(a) When a de facto sheriff is sued, it is no defense that he was not "irresponsible or untrustworthy" or dishonest or was acting otherwise than he could lawfully have done if he had been a de jure sheriff. Why should there be a different rule as to de facto directors?

(b) It is not true that to hold that de facto directors act at their peril would prevent "prudent and responsible men"—men "of caliber for these positions of trust"—from serving as directors. If men are prudent, trustworthy and responsible—are of such caliber that they will wisely conduct the bank's business—they will surely see to it that they themselves comply with so clear and simple a statutory requirement as is contained in § 72. Yates v. Jones National Bank, 206 U.S. 158, 179, 27 S.Ct. 638, 51 L.Ed. 1002, relates solely to de jure directors.

(c) Briggs v. Spalding, supra, seems to me not to be relevant. There, before anything had been done which resulted in loss to a bank, a director sold his stock and also orally resigned. The Supreme Court, in holding that he was not liable for acts done thereafter, stressed the fact that his oral resignation was valid and effective. From this fact my colleagues reason thus: Although the statute says that a director who ceases to own stock shall "thereby vacate" his office, the Supreme Court held, in effect, that, by the sale of his stock, a director does not cease to be a director; therefore, the failure, in the first instance, to own any shares would not prevent one elected as a director from holding such office. I entirely agree that the failure to own stock or the sale of stock theretofore owned does not mean that one who is elected as a director is not a director de facto and liable as such. Nothing in Briggs v. Spalding, goes further; it merely held, at most, that although a director had disposed of his shares, he would continue to be liable unless, before acts were done which occasioned loss to the bank, he had effectively resigned.

The defendant makes the following argument to show that a violation of § 72 will have some legal consequences even if what I believe to be the correct rule is rejected: § 73 requires each person when appointed or elected a director to take an oath that he is the owner in his own right of the requisite number of shares; as the pseudo directors here took such an oath, they perjured themselves, says defendant, and therefore could have been indicted and convicted for perjury. To that argument there are several answers: (a) § 73 is distinct and apart from § 72, so that punishment for perjury under § 73 is not a remedy for violation of § 72. Suppose a person elected a director violated § 72 and also failed to take the oath required by § 73; he could not then be criminally punished for violation of § 73 and yet, according to defendant and my colleagues, no civil liability would attach to his acting as director. (b) I find no cases which hold that a de facto sheriff who enters the land of another is immune from a civil action for trespass merely because he is criminally liable for perjury, when, in taking the oath of office, he falsely swore that he had complied with statutory provisions establishing qualifications for that office. (c) That criminal actions are available is ordinarily no bar to civil liability; many an actionable civil tort is also criminally actionable.[8] No one has ever suggested that even a de jure director is free from civil liability for his negligent acts because they are of such an aggravated character that he might also be convicted of a crime.

§ 72 provides not only that a director must own a certain number of shares, but also that he must be a citizen. The majority opinion so construes the section that one who is elected a director can ignore the condition as to owning shares, and yet become a de jure director with the defenses open to such a director. There is no conceivable reason for differentiating that requirement from the requirement as to citizenship. Accordingly, under the majority's interpretation, an alien can lawfully serve as a de jure director although the statute explicitly says that he "must" not. Congress, in § 72, said "must," but my colleagues hold that all it meant to say

---

[8] Moreover, everyone knows that a criminal action for a false oath is usually an inefficacious remedy. To say nothing of the difficulties arising from the statute of limitations in such an action, it would seem that to convict the pseudo directors for perjury would require proof—and beyond a reasonable doubt—that they were fully cognizant of the falsity of their statements.

442

was this: "We merely suggest that it would please us if every director were a citizen and owned a certain number of shares, but this is only a suggestion." My colleagues concede that there was a "lack of effective means of enforcing" § 72 until the statute was amended in 1933,[9] several years after the bank involved in this case had failed. But that alleged lack of "effective means" derives solely from the strange interpretation which my colleagues give to the statute. Admittedly § 72, as they construe it, had, before 1933, no practical legal consequences and was but a prayer or polite request. Its three sentences, consisting of some one hundred and eighty words, my colleagues, in effect, erase from the statute. I do not believe we are empowered to use such judicial erasers.

To be sure, courts, when trying to carry out the legislative intention, may disregard the literal meaning of words if it would lead to absurd results. It is true, too, that often a judicial interpretation of a statute unavoidably involves some judicial legislation. My betters have found no cause for apprehension in the inescapable necessity for some "law making" by courts;[10] it is folly to believe that the three traditional departments of government can avoid some overlapping of their functions.[11] But when courts go beyond modest "interstitial" judicial legislation, they are breaking away from constitutional restraints. Judicial legislation should not go so far as to eliminate legislative legislation unless it is unconstitutional.

Nor, except perhaps in most unusual circumstances, should judges impute to Congress the intention that a statutory provision is to have no practical effect. When Congress imposes a duty, it is queer to decide that the obligation to discharge the duty is to have no effective sanctions; one does not need to be a disciple of Hobbes or

Austin to believe that the legislature means to have its commands respected.

It is true that some statutes which use the word "must" or "shall," are properly interpreted as merely permissive or "directory" and not as mandatory; but those are exceptional interpretations made where it is apparent that the statutory provisions were "designed to secure order, system, and dispatch in proceedings," and that "by a disregard of" those provisions "the rights of parties interested cannot be injuriously affected."[12] The provisions of § 72 are not of that character. Obviously Congress, in stating that directors should be citizens and should own a certain amount of stock, established those qualifications because it considered that they would be for the protection of depositors. Consequently, § 72 was not designed merely to secure order and dispatch in the proceedings of the bank; a disregard of its provisions might well injuriously affect the rights of the depositors. When a sheriff fails to comply with a statute establishing qualifications for holding that office, and is sued for trespass by one whose land he has invaded, the courts hold that those statutory provisions are not merely "directory" but are "mandatory."

Judges should not rub out an unambiguous statutory provision simply because, if they had been members of Congress, they would have voted against it. The desirability of legislation is for the legislature, not for us. As we recently said, judicial amendments of legislation "would require consideration of questions of legislative policy * * *; to discharge that task efficiently we would be obliged to hold a sort of Congressional Committee hearing, at which all interested persons would be heard, so as to be sure that our amendments would not entail unforeseen and undesirable results. We have no power to embark on such an enterprise."[13]

---

[9] My colleagues refer to § 77 which provides for a removal of a director by the Board of Governors of the Federal Reserve System upon certification by the Comptroller of continuous violation of the banking statute; they also refer to § 71a. Both those sections first appeared in the statute in 1933.

[10] See authorities cited in Commissioner v. Beck's Estate, 2 Cir., 129 F.2d 243, 245, notes 3 and 4; Beidler & Brookmeyer, Inc., v. Universal Insurance Co., 2 Cir., 134 F.2d 828.

[11] See Bondy, The Separation of Governmental Powers, 5 Studies in History, Economics and Law, Columbia College (1896).

[12] French v. Edwards, 13 Wall. 506, 511, 20 L.Ed. 702; Escoe v. Zerbst, 295 U.S. 490, 494, 55 S.Ct. 818, 79 L.Ed. 1566; Lyon v. Alley, 130 U.S. 177, 185, 9 S.Ct. 480, 32 L.Ed. 899; Erhardt v. Schroeder, 155 U.S. 124, 128, 130, 15 S.Ct. 45, 39 L.Ed. 94.

[13] Commissioner v. Beck's Estate, 2 Cir., 129 F.2d 243, 246.